649 So.2d 683 (1994)
STATE of Louisiana
v.
Freddie L. ARMSTRONG, Defendant-Appellant.
No. CR94-307.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1994.
Writ Granted April 7, 1995.
*685 Jerry Jones, Dist. Atty., Richard Phillip Ieyoub, New Orleans, Charles L. Brumfield, Bastrop, for State.
Daryl Blue, Willie Hunter Jr., Monroe, for Freddie L. Armstrong.
Before DOUCET and PETERS, JJ. and BERTRAND,[*] J. Pro Tem.
PETERS, Judge.
The defendant, Freddie L. Armstrong, was charged by grand jury indictment with one count of second degree murder, a violation of Louisiana Revised Statutes 14:30.1. He pled not guilty and not guilty by reason of insanity as allowed by Louisiana Code of Criminal Procedure article 552. After trial by jury, he was convicted of the charge and sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. It is from this conviction and sentence that the defendant has appealed.

FACTS
The defendant suffers from a major mental illness or psychosis, the existence of which is documented as early as 1972 or 1973 when he was discharged honorably from the military service for medical reasons. A psychotic condition is one which may impair a person's ability to think, respond emotionally, remember, communicate, interpret reality, or behave appropriately. At the time he was discharged from the military service the medical diagnosis was undifferentiated or paranoid schizophrenia, a term used to describe a group of psychotic mental illnesses characterized by the disorganization of an individual's personality. One who suffers from paranoid schizophrenia has a personality dominated by delusions and hallucinations. A delusion is a false belief inconsistent with a person's culture, use or level of intelligence which cannot be altered by reasoning or argument. A hallucination is a false perception occurring without any true sensory stimulus. When a person is psychotic, or out of touch with reality, he may see visions, hear voices, have false beliefs, or have paranoid delusions or hallucinations, depending on the individual. According to the expert testimony presented in this case, a person in a psychotic state may or may not be able to differentiate right from wrong, depending on the circumstances and the individual. Additionally, the appropriate medication can control the symptoms of a psychotic condition although it will not cure the disease. The defendant has been administered Prolixin in various dosages as well as other medications since the onset of the disease.
On the afternoon of January 24, 1992, the defendant appeared at Loche's Mortuary in Bastrop, Louisiana, carrying a briefcase. After entering the mortuary building he walked into the business office where Reverend Fred Neal and Ms. Opeary Loche, one of the owners of the mortuary, were seated. When one enters the main door of the business, he finds himself in the lobby. The business office is located on the right side of the lobby and is accessed through a double glass door.
The defendant had been in the office approximately forty-five (45) minutes earlier seeking a copy of a death certificate, and when he was unable to obtain the copy, he left. Upon his return, Ms. Loche asked him if he wanted the death certificate copy, and he said "no." The defendant stood in the presence of the two individuals for approximately one minute and then placed the briefcase down and opened it.
Ms. Loche observed a large butcher knife lying in the opened case. Frightened by the knife's presence and the defendant's behavior, and not sure of the defendant's intentions, Ms. Loche immediately stood up and exited the office leaving the two men alone. She went to a business next door and informed the individuals present what she had seen. Her husband, Lee Loche, then called the Bastrop Police Department and asked for assistance.
Shortly thereafter, Officer Billy Womack of the Bastrop Police Department arrived at the mortuary in response to the call. His *686 understanding of the report was that an armed man was having a seizure in the mortuary. Upon entering the business office, Officer Womack observed Reverend Neal lying on the floor and the defendant standing over him holding a bloody butcher knife. When the defendant did not respond to Officer Womack's questions concerning what had happened, the officer stepped between the two men and kneeled down to determine Reverend Neal's condition. At about the same moment Officer Womack determined Reverend Neal exhibited no vital signs, Ms. Loche's husband, Lee Loche, appeared in the door of the office. According to Officer Womack, Mr. Loche shouted that the defendant was the person who had killed Reverend Neal. Officer Womack immediately drew his weapon, retreated from the inner office toward the mortuary entrance, and ordered the defendant to drop the knife. As Officer Womack retreated, the defendant, still armed with the knife, also walked out of the office door and proceeded up an adjacent staircase. Officer Womack then lost visual contact with the defendant.
Within minutes after the defendant ascended the stairs, Sergeant Hughie McDuffie and Officer John Smith of the Bastrop Police Department arrived at the scene. Sergeant McDuffie ordered Officer Womack to remain at the main entrance and await the arrival of additional law enforcement personnel. As Officer Womack maintained his post, the defendant reappeared down the stairs. With knife still in hand, he walked back into the office and kneeled down next to Reverend Neal's body. As Officer Womack watched, the defendant lifted Reverend Neal's head from the floor with his left hand, and using the knife in his right hand, severed the victim's head from his body. The defendant then stood up with the victim's head in his hands and held it up for the officer to see.
The defendant then placed the head down, picked up Reverend Neal's now headless body, and placed it in a chair. After moving the body, he retrieved the head, exited the office again and ascended the same stairs as before. Officer Womack remained at his post and again lost visual contact with the defendant when he walked up the stairs. Later the head of Reverend Neal was found in a commode located upstairs in the mortuary.
Within a few moments the defendant reappeared from the stairway and returned to the office. He then placed the knife inside his briefcase and walked toward the main entrance with briefcase in hand as if nothing had happened. As he exited the building, five or six officers subdued and handcuffed him.
The autopsy of Reverend Neal's body was performed by Dr. Jay Parker Mashburn, a forensic pathologist with the Caddo Parish Coroner's office. Dr. Mashburn determined that the victim's body had been subject to over twenty separate stab or incisional wounds, with the ones over the front of the chest having caused his death. Reverend Neal was eighty one (81) years old at the time of his death.

PROCEDURAL HISTORY
Four days after the incident, the trial court granted a joint motion by the state and defendant to appoint a sanity commission to evaluate the defendant's capacity to proceed as well as his mental condition at the time of the offense. La.Code Crim.P. arts. 643 and 650. On April 2, 1992, the Morehouse Parish Grand Jury returned an indictment against the defendant for second degree murder. At a hearing on April 7, 1992, the trial court concluded the defendant lacked the mental capacity to proceed and ordered him confined for treatment at the Feliciana Forensic Facility in Jackson, Louisiana. At a second hearing on July 10, 1992, the trial court concluded the defendant had regained the capacity to proceed thereby allowing the state to reinstate prosecution of the charge. La.Code Crim.P. art. 642. The defendant was arraigned on July 30, 1992, and pled not guilty and not guilty by reason of insanity. On August 12, 1992, the defendant filed a motion to have his medication terminated. This motion was denied at a hearing on October 20, 1992. The motion was reargued immediately prior to trial and again denied. Because of the publicity this crime generated in the Morehouse Parish area, the trial was moved to Lafayette Parish. Trial began on September *687 27, 1993, and ended with a verdict of guilty on October 1, 1993. After hearings on post conviction motions and sentencing, the defendant timely perfected this appeal assigning the following seven assignments of error:
1. The trial court erred in finding Mover guilty based on insufficient evidence;
2. The trial court erred in denying Mover's request to be taken off medication;
3. The trial court erred in denying Mover's Motion for Post Verdict Judgment of Acquittal, or Not Guilty by Reason of Insanity or in the Alternative a New Trial;
4. The trial court erred in finding that Mover did not prove his insanity at the time of the offense;
5. The trial court erred in finding that Dr. Lawanna Gunn was not an expert whereby she could render an opinion relative to Mover's ability to distinguish right from wrong;
6. The trial court erred in not finding that the District Attorney's argument in rebuttal were (sic) improper, prejudicial and a denial of Defendant's right to a fair trial; and,
7. The trial court erred in denying Mover's special jury instruction relative to treating physicians.

ASSIGNMENTS OF ERROR NUMBERS 1, 3, AND 4.
These three assignments can best be considered together. The defendant contends there was insufficient evidence presented to find him guilty beyond a reasonable doubt; that the trial court should have granted his post trial motions for acquittal or for a verdict of not guilty by reason of insanity, or in the alternative for a new trial; and that the trial court erred in finding that the defendant did not prove his insanity at the time of the offense.
As the reviewing court we must first consider whether the state proved each and every element of the crime of second degree murder beyond a reasonable doubt. When the issue of sufficiency of evidence is raised on appeal, the reviewing court must view the evidence in the light most favorable to the prosecution. The critical inquiry is whether after such a review, the reviewing court can conclude that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983); State v. Duncan, 420 So.2d 1105 (La. 1982); and State v. Moody, 393 So.2d 1212 (La.1981). The reviewing court must be mindful that it is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1. In this case, the uncontradicted evidence is overwhelming that the defendant killed Reverend Neal. Viewing the evidence in the light most favorable to the prosecution and applying the presumption of Louisiana Revised Statutes 15:432 that a defendant is sane and is responsible for his actions, any rational trier of fact can conclude that the defendant is guilty of the second degree murder of Reverend Neal. Upon the completion of the state's case, the burden shifts to the defendant to overcome the presumption of Louisiana Revised Statutes 15:432 and establish by a preponderance of the evidence the defense of insanity at the time of the offense. La.Code Crim.P. art. 652. The question of whether a defendant has affirmatively proved his insanity is one to be determined by the trier of fact. State v. Marmillion, 339 So.2d 788 (La.1976). All the evidence, including both expert and lay testimony, and the actions of the defendant, should be considered by the trier of fact in determining sanity. State v. Pravata, 522 So.2d 606 (La.App. 1st Cir.), writ denied, 531 So.2d 261 (La.1988). The legal definition of insanity is set forth in Louisiana Revised Statutes 14:14 which provides:

*688 "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility."
Thus, the existence or nonexistence of a mental disease or defect is not the issue. The question to be answered by the trier of fact is whether the offender could distinguish right from wrong with reference to his conduct.
The applicable standard of review when a defendant pleads insanity also requires an analysis from the standpoint of the rational trier of fact. The question to be answered is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Roy, 395 So.2d 664 (La.1981) and Jackson v. Virginia, supra.
At trial numerous expert witnesses were called, including Dr. William J. Erwin, a Monroe, Louisiana psychiatrist; Dr. Claude K. Smith, a West Monroe, Louisiana, general practitioner, who is also the Ouachita Parish coroner; Dr. Francis D. Elias, a Bastrop, Louisiana, radiologist; Dr. David D. Thomason, a Monroe, Louisiana, clinical psychologist; Dr. Frank Weinholt, a Monroe, Louisiana, psychiatrist; Dr. Norman L. Mauronner, a contract psychiatrist at the Feliciana Forensic Facility; and Dr. Debora Murphy, a Monroe, Louisiana, psychiatrist. Additionally the report of Dr. Paul Ware, a psychiatrist of Shreveport was introduced into evidence, as were defendant's medical records from the Veterans Hospital in Shreveport, the Woodland Hills Psychiatric Hospital in West Monroe, the Central Louisiana State Hospital in Pineville, and the Feliciana Forensic Facility in Jackson.
Dr. Erwin became the defendant's treating physician in June of 1980 on a referral from the Veterans Administration Hospital in Shreveport, Louisiana, and remained so until the doctor's retirement in 1990. According to the doctor, the defendant's medical records at that time reflected a history of acute schizophrenic disorder which apparently manifested itself in Vietnam. It also revealed periods of grossly psychotic behavior by the defendant, controlled by medication. According to Dr. Erwin, the defendant's disease is not curable but controllable by medication. Dr. Erwin testified that when the defendant fails to receive his proper medication and he becomes psychotic, certain danger signs arise. These include:
 Insomnia;
 Agitation;
 Development of a preoccupation with religious matters, especially as it pertains to the relationship between good and evil; and
 Difficulty in communicating in that his speech would not hold together.
According to Dr. Erwin, the defendant's preoccupation with the religious conflict controls his whole life when he is in a psychotic state and the paranoid delusions and hallucinations begin to exhibit themselves.
Dr. Erwin testified that when the defendant is not in a psychotic state, he is not insane, and during his ten year professional relationship with the defendant, the doctor only observed him in a psychotic state on two occasions. The first was in the mid-1980's when he was placed in the Veterans Hospital, and the second was in 1987 when the defendant was brought to Dr. Erwin by his wife and minister because of his deteriorating condition. On that occasion Dr. Erwin committed the defendant to Woodland Hills Psychiatric Hospital in Ouachita Parish under a Physician's Emergency Certificate. Although the doctor had not seen the defendant professionally since November of 1990, he concluded that,
"In my considered opinion, there is no way in the psychotic state which I have observed in Freddie that he would be able to distinguish right from wrong."
Dr. Erwin did acknowledge in his testimony that at times, even individuals who are in a psychotic state are still capable of distinguishing right from wrong. Also, he acknowledged that on numerous occasions during his treatment of the defendant, Dr. Erwin *689 had observed him agitated but not psychotic.
As parish coroner, Dr. Smith examined the defendant on January 13, 1992, and concluded he was a danger to himself because he was contemplating suicide. The defendant had not been sleeping, was in a daze and was very depressed. Dr. Smith had him committed to a hospital pursuant to a Coroner's Emergency Certificate. The defendant was released from that confinement on January 21, 1992, just three days before the offense. At trial, Dr. Smith expressed no opinion as to the defendant's mental condition at the time of the offense.
The day after the offense Dr. Elias was called to the Bastrop city jail to examine the defendant. He did not perform a psychiatric examination because, as a radiologist, he was not qualified. The defendant fully communicated with the doctor who took no action to remove him to a hospital facility. The doctor concluded that because the defendant was isolated from the rest of the prison population, he was not a danger to others despite the disturbance he was apparently creating. He was simply an inconvenience and discomfort to the others. Dr. Elias expressed no opinion as to the defendant's mental status at the time of the offense.
A battery of psychological tests were administered to the defendant by Dr. Thomason in December of 1992. Each question was read to the defendant who answered them orally. Based on the test results, Dr. Thomason concluded the defendant was functioning at a mental state of high mental retardation. He also concluded the defendant did not have a profile indicative of a true paranoid schizophrenic, but one more appropriately associated with a hysterical person who is very self-centered and compulsive. Such a personality, according to the doctor, requires things to be a certain way and becomes upset when he does not get what he wants. He suggests these are personality traits and not evidence of schizophrenia. He did conclude, however, that the defendant was clearly psychotic and therefore not in touch with reality.
In addition to administering the battery of tests, the doctor also conducted an extensive interview in which the defendant was able to recall the details of the offense and the entire day leading up to the offense. This recall was despite the fact that the interview occurred almost one year after the offense.
The defendant told the doctor that he had gone to Woodland Hills Hospital on the morning of January 24, 1992, to obtain his medication and when he was unsuccessful in that regard, he went to see his brother-in-law at his place of business. He was unsuccessful in locating his brother-in-law so he returned home at approximately 10:30 in the morning. No one was at home, and not wanting to be alone, he then went to his mother's home. As he arrived there his mother was apparently preparing to leave, so he then went to the Morehouse Parish Courthouse to obtain a copy of his minister's license. After accomplishing that task, he then made his first trip to the mortuary. The defendant remembers that this occurred at about 12:30 in the afternoon. His father had apparently died the year before and he inquired about obtaining a copy of his father's death certificate. When he was unsuccessful in this endeavor, he returned home and made some telephone calls trying to find someone to talk to. He remembered reaching one of his preacher friends who did not have time to speak with him. He then placed the butcher knife in his briefcase and returned to the mortuary. According to the defendant, he did not enter the building immediately but sat in his car and listened to the music on the radio. While sitting in his vehicle, he saw Reverend Neal enter the mortuary. Upon seeing the victim he immediately received an auditory hallucination saying, "That's him."
At this point in the interview, the defendant informed Dr. Thomason of his belief that Reverend Neal was one of a group of preachers who had "taken his stone" while he was a patient in Woodland Hills Hospital. The doctor interpreted this as a description of a "sexual" attack of the defendant by the preachers.
He then explained that he believed Reverend Neal to be the anti-christ. He severed the head from Reverend Neal's body to prove this belief, because if he were the anti-christ, he would not bleed. The defendant *690 acknowledged to Dr. Thomason that in retrospect, he knew he did wrong. He even acknowledged that while he was stabbing the victim a voice said, "This is wrong." The defendant told Dr. Thomason that prior to the attack, because of this internal struggle, he had considered not killing Reverend Neal, and had Reverend Neal gone upstairs with him he would not have killed him. He had only stabbed the victim once or twice when the voice told him what he was doing was wrong. Reverend Neal was still alive at that moment because as the defendant continued to stab him, Reverend Neal grabbed the defendant's tie in an effort to defend himself.
Dr. Thomason acknowledged that how much of that which was related to him actually played a part in the commission of the offense was "very difficult to determine." He interviewed the defendant a second time and discussed with him his state of mind. The doctor concluded that the defendant was clearly psychotic at the time of the offense and was acting out his fixed delusions. In doing so, the doctor concluded that the defendant did not know right from wrong at the time of the offense.
Dr. Weinholt was one of the members of the original sanity commission who examined the defendant in late February or early March of 1992. At that time, he found the defendant's condition so unstable that his examination was limited to the question of the defendant's capacity to proceed rather than his state of mind at the time of the offense. He found the defendant to be delusional and dwelling on his obsession with the existence and destruction of those who represented the anti-christ.
He again saw the defendant on July 24, 1992. At that time the defendant could communicate easily about the legal system and his current status, but would avoid talking about the offense. Still, he did relate to Dr. Weinholt that a voice had told him to stop after he began the attack, but he had gone too far at that point. He also informed the doctor that God had already forgiven him for what he had done, and he identified Reverend Neal as being a participant in the alleged sexual attack on him.
Although the doctor acknowledged that if the defendant did hear a voice telling him he was doing wrong, this would indicate that he knew right from wrong, he still concluded that the defendant was insane at the time of the offense.
While the defendant was at Feliciana Forensic Facility in April and May of 1992, he was seen by Dr. Mauronner. Both of these examinations by the doctor were related to the question of the defendant's capacity to proceed at trial. On both occasions, the doctor concluded the defendant had the capacity to proceed. In fact, it was Dr. Mauronner's opinion that, despite the findings of the court appointed sanity commission, the defendant had no psychotic difficulty that would have prevented him from proceeding with trial the day he entered Feliciana Forensic Facility. Despite this opinion as to capacity to proceed, and based on a review of records only, the doctor testified at trial that the defendant was insane at the time of the offense.
Dr. Murphy was the only expert called by the state relative to the issue of the defendant's state of mind. She also was a member of the original sanity commission and first examined the defendant on February 17, 1992. At that time she found him suspicious, hypervigilant and with intense eye contact. However, she also found him to be able to communicate and understand his position. As a part of her mental examination performed on the defendant at that time, she was made aware that the defendant believed he had already been forgiven for his actions. Dr. Murphy was the one member of the sanity commission who determined that the defendant had the capacity to proceed. Based on her examination at that time, she also concluded he was legally sane at the time of the offense.
A second examination was performed by Dr. Murphy at her office in July of 1992. As a part of that examination, the defendant related to her that he had gone to the mortuary to confront Reverend Neal for his part in the "sexual" attack on him.
When asked about the possibility of determining mental status from records alone, she testified that it was her policy to never make *691 a sanity decision without having performed a mental status examination. When asked whether a person can be excused for his conduct because of a thought content disorder, the doctor replied,
"The presence of a thought content disorder does not mean that you're excused from knowing the difference between right and wrong. He had a thought content disorder. I, also, in my opinion believe he knew the difference between right and wrong. He knew the difference between God's law and man's law. He had his ideas of what court process was and what the court proceedings were."
The doctor was asked the question as to whether a person would know the difference between right and wrong when he was in an active phase of a schizophrenic disorder. The questions and responses were as follows:
"Q. is it probable or possible that a person would not know the difference between right and wrong?
"A. Active just means he has presence of symptoms. That doesn't have anything to do with his judgment of right or wrong. It doesn't have to have anything to do with it.
"Q. But is it probable? Is it possible?
"A. It's not probable. It might be possible."
Dr. Murphy testified at trial that the defendant was capable of determining right from wrong at the time of the offense.
Lay witness testimony presented by the defendant included that of Sergeant Hughie McDuffie, and Officers John Smith, Sarah Coleman, and Christopher Relford of the Bastrop Police Department; Jamie Mayo, the defendant's brother-in-law and a Ouachita Parish Allstate Insurance Company employee; Ms. Vella Armstrong, the defendant's wife; and Reverend Lee Edward Armstrong, of Bastrop, the defendant's uncle. Basically the testimony described the absolute chaos at the mortuary and the events at the city jail after the defendant's arrest.
Sergeant McGuffie and Officer Smith simply described the scene of the offense, including the fact that the defendant was not the only one acting unusual there. Sergeant McGuffie testified that Officer Womack simply went "berserk" and Officer Smith became violently ill. Officer Smith also related that he remembered stopping the defendant a few days before the offense for speeding. He described the defendant as being coherent and complaining that the officer had stopped the wrong person. His behavior on that occasion, according to Officer Smith, was not unlike his behavior on the day of the offense.
Officer Sarah Coleman took the defendant to the doctor from the Bastrop City Jail the day after the offense to have a cut on his left hand treated. When they returned to the jail the defendant tore off the bandage and began to bite his wound. According to Officer Coleman, the defendant was placed in restraints on January 25, 1992, but tore free of them.
Officer Christopher Relford testified of the difficulties in getting the defendant to take his medication after his incarceration, of trying to prevent him from stopping up the urinal and flooding the cell, and of the defendant refusing to dress and walking around naked. Still, on numerous occasions, the officer and the defendant had conversations in which the defendant had no trouble conversing.
Mr. Mayo recalled that his brother-in-law had called him at 6:00 in the morning of the offense and again one hour later. He was coherent and able to carry on a conversation. The next time he saw the defendant was Monday or Tuesday after the offense which occurred on Friday. At that time the defendant knew who he had killed, and although he spoke about bizarre events, he was able to understand that his brother-in-law had brought an attorney to help and understood the purpose of the attorney.
The defendant's wife testified as to his need for his medication and his medical history. She related that on January 13, 1992, when he was committed by Dr. Smith, he was very nervous and had lost sleep over a dispute with a local bank.
The defendant's uncle testified that he talked with the defendant by telephone the morning of the offense. The conversation concerned a doctor's appointment at 10:00 *692 that morning which the defendant failed to keep. He also saw him in jail on the day after the offense and talked him into taking his medicine.
The state presented testimony of Becky Yates and Elaine Bryan, two employees of the Morehouse Parish Clerk of Court who had contact with the defendant at the clerk's office around noon or the early afternoon on the day of the offense. The defendant appeared at the office and requested a copy of his minister's registration certificate. After reviewing the certificate he asked one of the clerks to make a change correcting the spelling of the church where he served as pastor. Neither witness testified to anything out of the ordinary in his actions or appearance.
Thus, the jury was presented with four experts who concluded the defendant was insane at the time of the offense and one who concluded otherwise. Dr. Erwin suggested to the jury that one of the principal symptoms of the defendant being in a psychotic state was his inability to communicate, yet numerous witnesses testified as to the defendant's ability to communicate on the day of the offense as well as thereafter. The jury was presented with two possible motivations for the defendant's actions. One was the divine guidance of God in telling the defendant to kill the anti-christ as represented by Reverend Neal, and the other was the all-too-human need to avenge a sexual assault. Even assuming the defendant was responding to voices, he did not respond to the voice he claims told him what he was doing was wrong.
The jury was required to sift through conflicting testimony and was obligated to weigh the respective credibility of the witnesses in reaching the verdict. In returning the verdict of guilty, the jury either concluded that the defendant was not suffering from a mental disease or defect at the time of the offense, or if he was, that mental disease or defect did not render him incapable of distinguishing right from wrong. In either case, considering the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of second degree murder proven beyond a reasonable doubt. Additionally, considering the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was legally insane at the time of the offense. Therefore, we find these assignments of error to be without merit.

ASSIGNMENT OF ERROR NO. 2.
On August 12, 1992, a contradictory hearing was held on the defendant's motion to be taken off medication, and the motion was denied. The defendant reargued the motion at the start of trial, and it was again denied. However, no objection to the ruling was raised until the end of the trial. Despite this lack of contemporaneous objection, we find no merit in the assignment. The defendant contends this denial was a violation of his right to a fair trial under Louisiana Constitution article 1, section 16. He contends he should be allowed to appear at trial in an unmedicated condition, even if his lack of medication renders him incapable of assisting his counsel. His stated purpose is to exhibit to the jury his condition at the time of the offense.
A mentally ill defendant does not have an absolute due process right to the suspension of involuntary administration of antipsychotic medication. Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). However, when a defendant moves to terminate the involuntary administration of such medication, the state must show that the treatment is appropriate and, considering less intrusive alternatives, essential for the safety of the defendant and others. Id. at ___, 112 S.Ct. at 1815.
At the hearing on the motion, Dr. Murphy testified that if the defendant were removed from medication, one would see a "resumption of his psychotic features, a deterioration of his thought processes, aggressiveness and... acting out behavior that could endanger himself or others." She went on to say that "As he deteriorates, his ability to assist will worsen and potentially it will get so bad that he cannot assist his attorney." Dr. Murphy felt the defendant should be maintained on *693 his medication, Prolixin, for the sake of the court and jail personnel. The only other options available were more intrusive and potentially more damaging to the defendant.
Even assuming a timely objection, we find no error in the trial court's rulings denying defendant's motion. The denial had the effect of protecting defendant from himself and protecting others from defendant. Additionally, no trial could have been held without the defendant's ability to assist counsel. The defendant's experts were allowed to present testimony as to defendant's mental status at the time of the offense and as to the effect of Prolixin on defendant's demeanor at time of trial.

ASSIGNMENT OF ERROR NO. 5.
Dr. Lawanna Kay Gunn was called by the defendant, and recognized by the court, as an expert certified rational behavior therapist. This assignment arises because the trial court refused to allow Dr. Gunn to express an opinion as to the defendant's ability to distinguish right from wrong.
The determination of a witness's competence to testify is left to the discretion of the trial court subject to appellate review. U.S. v. Riggleman, 411 F.2d 1190 (4th Cir. 1969). Additionally, the qualifications needed to express an opinion on a given topic are to be decided by the trial judge alone. Jenkins v. U.S., 307 F.2d 637 (D.C.Cir.1962). Louisiana Code of Evidence article 702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Dr. Gunn has a Bachelor of Arts degree in Social Welfare, a Master of Science in Education, and a Ph.D. in Counseling Psychology. She also claims to be a certified clinical hypnotist and a qualified mental retardation professional. She is not a licensed counselor or psychologist and has been denied the opportunity to testify in the past concerning the question of sanity of a defendant. Although accepted as an expert rational behavior therapist, there exists no licensing authority for such a field of expertise. Additionally, she has been reprimanded in the past by the state Licensing Board of Examiners for Psychologists for using variations of the term "psychologist" in describing her profession.
We find no error in the trial court's refusal to allow Dr. Gunn to testify as to the issue of sanity at the time of the offense.

ASSIGNMENT OF ERROR NO. 6.
The defendant argues in brief that various statements made by the state in rebuttal argument before the jury appealed to the prejudices and biases of the jury and were not confined to answering the argument of defendant, thereby violating the provisions of Louisiana Code of Criminal Procedure article 774. With the exception of one incident, the defendant failed to object to any statements made by the state during the course of closing argument and rebuttal. The issue as to the propriety of closing argument remarks is not preserved for review where defense counsel makes no objection to the statement either during or after the argument. State v. Whitmore, 353 So.2d 1286 (La.1977). Stated another way, objections to remarks of a prosecuting attorney must be timely made in order to preserve the error on appeal. State v. Batiste, 318 So.2d 27 (La.1975).
The scope of argument by counsel is governed by Louisiana Code of Criminal Procedure article 774, which provides:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
"The argument shall not appeal to prejudice.
"The state's rebuttal shall be confined to answering the argument of the defendant."
If an argument goes beyond the permissible scope of this article, but does not reach the level of mistrial as defined in Louisiana Code of Criminal Procedure article 770, the proper remedy is an admonishment to the jury under Louisiana Code of Criminal Procedure article 771. Thus, the remedy *694 depends upon whether the improper argument falls within the scope of article 770 or 771. The trial judge has discretion in controlling the scope of argument and, upon request, may either declare a mistrial or admonish the jury, depending on whether the trial court determines that the objected to argument is irrelevant or immaterial and whether it is of such a nature that it might create prejudice against the defendant in the mind of the jury. State v. Prestridge, 399 So.2d 564 (La.1981). In order for argument outside the scope of Louisiana Code of Criminal Procedure article 774 to be reversible error, the court must be thoroughly convinced that the jury was influenced by the complained of remarks and that the remarks contributed to the verdict. State v. Dupre, 408 So.2d 1229 (La.1982).
The one occasion where the defense counsel objected to the state's rebuttal was when the state referred to defendant's "store bought psychiatrists." The trial court admonished the state and instructed the jury to disregard the statement. Credit should be given the good sense and fairmindedness of jurors who have been instructed repeatedly by the trial judge that arguments of counsel are not evidence. State v. Kyles, 513 So.2d 265 (La.1987), cert. denied, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). This immediate action by the trial court in sustaining the objection, admonishing the state and properly instructing the jury to disregard the challenged remark decreased the likelihood that the jury was influenced by the remark. State v. Deboue, 552 So.2d 355 (La. 1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990).

ASSIGNMENT OF ERROR NO. 7.
By this assignment the defendant contends the trial court erred in denying defendant's special jury instruction relative to treating physicians. Since this assignment was not briefed by the defendant, we consider it abandoned. Uniform Rules-Courts of Appeal, 2-12.4.
ERRORS DISCOVERABLE BY INSPECTION OF THE RECORD.
In addition to review of the assignments of error, Louisiana Code of Criminal Procedure article 920 requires appellate review for errors discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. A review of this record reflects no such errors.

CONCLUSION
For the reasons set forth herein, the verdict of the trial court is affirmed in full.
AFFIRMED.
NOTES
[*] Honorable Lucien Bertrand, Jr., participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.