The **PEOPLE** of the State of Colorado,
Plaintiff–Appellee,

v.

Robin V. **TALLY**, Defendant–Appellant.

No. 97CA0362.

Colorado Court of Appeals,
Div. II.

April 29, 1999.

Certiorari Granted Aug. 28, 2000.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, John D. Seidel, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David F. Vela, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CRISWELL.

Defendant, Robin Tally, appeals the judgment entered on a jury verdict finding him guilty of first degree murder. We affirm.

Defendant and his victim both commenced work with a cable television company at about the same time. During the succeeding year, however, defendant formed the impression that the victim was being favored over him, which he resented. In addition, his work deteriorated, and about one year after he was hired, defendant's employment was terminated.

Several months later, defendant discovered the victim making a service call in the area in which he lived, and he accosted her verbally, warning her that she was "in his territory." He later told his former supervisor that, if the victim was not kept off his "turf," he would "go to a higher level of security."

Several days later, defendant again found the victim making a service call in his neighborhood. He shot her three times with an automatic pistol; she fell on her back and was shot three more times.

Defendant then proceeded immediately to a local police station where he announced that he had just shot someone. Ultimately, he gave a detailed account of the killing, and the officers recovered the murder weapon from his car.

At trial, defendant's principal defense was that he was insane at the time of the offense. This defense was based upon expert opinion that, while defendant understood that killing

was legally wrong, he believed that God had given him permission to kill the victim.

Pursuant to § 16–8–104.5, C.R.S.1998, a unitary trial before the same jury was held to determine both defendant's substantive guilt and the issue of his sanity. The jury found that he was sane and guilty of first degree murder, and the court entered judgment on that verdict.

## I.

Defendant's mental competency to stand trial and related issues were the subject of several hearings in the trial court. Initially, following a court-ordered psychiatric examination and hearing, the court found that defendant was incompetent to proceed and ordered that he be committed to the Colorado State Hospital until restored to competency. Several months later, at the People's request, the court held a hearing to determine whether defendant should be forcibly medicated, after which the court authorized the State Hospital to do so.

Later, the trial court held another hearing to determine if defendant had been restored to competency. Following that hearing, the court determined that he had been restored to competency, but that forced medication was still required. Hence, it directed that defendant be returned from the State Hospital, but that he continue to receive medication during his pre-trial confinement and trial.

Based on this series of hearings and orders, defendant asserts that the trial court erred in requiring his involuntary medication and in determining that he had been restored to competency. We reject both assertions.

## A.

Defendant's contention that the court erred in requiring his forced medication is grounded upon his basic premise that forcing him to appear before the jurors in his medicated, rather than his natural, state caused them to be given a false impression of his true mental condition. The result, he asserts, was a violation of his due process and other constitutional rights. We disagree.

In *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Supreme Court held that the forced administration of antipsychotic drugs to a defendant violates due process precepts absent a determination that such administration is medically appropriate and that there is an overriding justification for the use of such drugs. It suggested, however, that due process considerations will be satisfied if it is demonstrated that the administration of the drugs is medically appropriate and that, after consideration of less intrusive alternatives, it is determined that their use is essential to protect either the defendant's or other persons' safety.

Likewise, in *Donaldson v. District Court*, 847 P.2d 632 (Colo.1993), our supreme court authorized the involuntary administration of such drugs if, in an adversarial proceeding, the petitioning party establishes, by clear and convincing evidence, four factors, as follows: (1) the patient is incompetent to participate effectively in the treatment decision; (2) treatment by antipsychotic drugs is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood that the patient will cause serious harm to the patient or to others in the institution; (3) a less intrusive treatment alternative is not available; and (4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

Here, after an evidentiary hearing upon the People's initial request to medicate defendant involuntarily, the trial court found that: (1) defendant had previously been found to be incompetent; (2) he had become belligerent and had threatened to kill hospital staff members; (3) he was suffering from a delusional disorder that rendered him incompetent to participate effectively in any treatment decision and had refused to take medication voluntarily; (4) treatment by use of antipsychotic drugs was necessary to prevent a significant and likely long-term deterioration in the defendant's mental condition; (5) in the absence of such treatment, it was likely that he would cause serious bodily

harm to others; (6) less intrusive treatment alternatives, such as verbal therapy and group counseling, had been attempted but had been unsuccessful; and (7) the medications could have serious side effects.

The expert testimony before the court at the time it made these findings was that the side effects of the antipsychotic drug involved, haloperidol, consisted of the possibility, with long term use, of the development of tardive dyskinesia, i.e., the involuntary and abnormal movement of the lower face, including grimacing, panting, twisting of the head, and tongue protrusion. Likewise, the patient can develop extra-pyramidal symptoms with presentation similar to that seen in persons with Parkinson's disease, i.e., tremor of the tongue, fingers, legs and toes, as well as difficulty in initiating foot movement and arising from a sitting position.

There are drugs designed to alleviate these physical side effects, but there is no evidence that defendant exhibited any of these tremors or abnormal movements.

The drug affects the mental and emotional aspects of the patient by calming him or her and, ultimately, by having the patient become more aware of reality; it works to aid in removing the patient's delusions. However, there was no evidence that administration of this drug would affect defendant's ability to concentrate, would make him drowsy, or would otherwise present any adverse mental or emotional reactions (except those that might be associated with the physical side effects, if developed).

Evidence before the court at the time of the hearing on the People's motion supports the court's findings. In addition, those supported findings meet the due process requirements of *Riggins v. Nevada, supra,* as well as the first three requirements of *Donaldson v. District Court, supra.*

Further, the trial court's findings also support the conclusion that, consistent with *Donaldson's* fourth requirement, defendant's need for the required drugs was sufficiently compelling as to override defendant's pretrial interest in refusing treatment.

Several months after the entry of this order, the People asserted that defendant had

been restored to competency, and a hearing upon this issue was held. The court concluded that he had been so restored, primarily as a result of his treatment with the antipsychotic drug. Hence, it ordered the parties to trial. It determined, however, that defendant could not remain in a competent state unless he continued to be treated with haloperidol. Hence, it also directed his continued involuntary medication of this drug.

Prior to trial, defendant moved to have the court rescind its directive for continued medication. In doing so, however, he did not assert that the administration of the drug was interfering with his ability to recall, to understand, to relate, or to cooperate with counsel. Nor did he allege, at that time, that it was causing undesirable physical side effects. His sole ground for the relief requested was his assertion that, after his removal from the State Hospital, the court no longer had authority to require his continued medication. The court denied this motion without comment. Defendant does not raise this issue in this appeal.

*Riggins v. Nevada, supra,* does not make clear the extent to which due process would allow the administration of an antipsychotic drug to a defendant with the sole aim of restoring one who is incompetent to competency so that he or she might be tried. While the court suggested that such a purpose "might" evidence an overriding state interest, it also specifically refused to determine "whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial. . . ." *Riggins v. Nevada, supra,* 504 U.S. at 136, 112 S.Ct. at 1815, 118 L.Ed.2d at 490. In addition, Justice Kennedy's special concurrence states a strong case for the proposition that forcible medication given solely for such a purpose would rarely be permissible.

■ Here, however, the record does not suggest, and the trial court's first order directing that defendant be medicated was not based upon the proposition, that administration of the drug was aimed at restoring defendant to competency. On the contrary, administration of the drug was specifically

found to be required to prevent defendant from seriously harming himself or others and to prevent a further deterioration in his mental condition. And, those justifications remained valid even after the court determined that the drug had had the additional effect of restoring defendant to a mental state in which he was capable of understanding the nature and cause of the proceedings against him, of participating and assisting in his defense, and of cooperating with counsel. *See* § 16–8–102(3), C.R.S.1998.

■ Under these circumstances, we need not decide whether the forced administration of drugs is proper if the sole purpose of such administration is to restore a defendant to competency. We do hold, however, that if, as here, there are independent reasons for involuntary administration of drugs that continue to exist after a defendant is restored to competency, the fact that those drugs play a significant role in that restoration does not vitiate the finding of competency nor render inappropriate the continued administration of those drugs.

■ Further, we recognize the importance that the jurors' physical impression of a defendant may be to their determination of the issue of that defendant's insanity. We also recognize that the drug administered to defendant altered his "persona" and may have caused him to present himself to the jury in a mental state entirely different from his natural state. Here, however, the jurors were given substantial descriptive testimony both of his mental state at or about the time of the killing and how the antipsychotic drug worked upon him to change that mental state. Under these circumstances, we cannot conclude that forcing him to trial while the drug was working its effect upon him violated any of his constitutional rights. *See Lawrence v. State*, 265 Ga. 310, 454 S.E.2d 446 (1995); *State v. Armstrong*, 649 So.2d 683 (La.App.1994), *rev'd on other grounds*, 671 So.2d 307 (La.1996); *State v. Baker*, 245 Neb. 153, 511 N.W.2d 757 (1994).

We conclude, therefore, that the court did not err in entering its orders requiring that defendant be involuntarily medicated both before and during the trial.

### B.

Defendant also contends that the trial court erred when it refused to instruct the jury that he had been under the influence of antipsychotic drugs during the trial. We reject this contention.

■ Throughout the trial, starting even with counsel's opening statement and continuing through the testimony of several witnesses, the jurors were made aware that defendant was being treated with drugs. The effect of the drugs upon defendant's behavior was also described to the jurors.

The instruction tendered by defendant would have informed them that he was receiving drugs against his will and that the medication "severely affects" defendant's mental functioning, as well as his outward appearance and demeanor. It also would have told them that his function and demeanor were "significantly altered from their normal condition and are drastically altered from their state" on the date of the offense.

The giving of this instruction would have been improper because it would have directed the jury to accept, as fact, part of a witness' testimony. *See People v. Lybarger*, 790 P.2d 855 (Colo.App.1989), *rev'd on other grounds*, 807 P.2d 570 (Colo.1991).

Here, the jury had been presented with evidence relating to defendant's medication and its effect upon his mental outlook and demeanor. It was for the jury, and not for the court, to evaluate this evidence. The court committed no error in refusing to give a further instruction upon the subject.

### C.

Defendant next contends that the evidence before the court was insufficient to support its finding that he had been restored to competency. Again, we disagree.

Defendant bases his argument on certain testimony given by a psychiatrist on the staff of the State Hospital where defendant was committed. Specifically, the psychiatrist testified with respect to a report made by another staff member which observed that defendant was still not completely in touch with

reality, had expressed a belief that people did not exist if he could not see them, and had stated that he thought there was a conspiracy against him. This reporting psychiatrist had also acknowledged that, at times, defendant expressed a belief that his victim was still alive.

In his other testimony, however, the expert witness explained that report and expressed the opinion that defendant was competent. He testified that defendant's delusional beliefs had subsided and that, for the most part, defendant had accepted reality. He also testified that defendant had done "quite well" on a competency assessment that had addressed two major areas: (1) whether defendant had a realistic appreciation of the charges against him and the consequences of those charges; and (2) whether he could work effectively with his counsel.

The test of competency is whether the defendant is suffering from such a mental disease or defect that he or she is rendered incapable of understanding the nature and course of the proceedings against him or her, of participating or assisting in the defense, or of cooperating with counsel. Section 16–8–102(3), C.R.S.1998.

Hence, while there is some evidence that would support a contrary finding, the court's finding of competency here is supported by expert opinion and, for that reason, cannot be set aside by us. *See People v. MacCallum*, 925 P.2d 758 (Colo.1996).

### D.

Defendant also asserts the trial court erred when, during trial, it failed to re-evaluate defendant's competence to proceed. His primary contention is that the court should have made further inquiries as to his competency based on the statements he made with respect to the advisement given him pursuant to *People v. Curtis*, 681 P.2d 504 (Colo. 1984). We reject this assertion.

During his *Curtis* advisement, which occurred on a Friday, defendant stated that he understood that it was his decision whether to testify and that, if he testified, he would be subject to cross-examination. He also stated that he was not going to testify and that his decision was a free and voluntary choice.

On the following Monday, however, defendant informed the court that he did not believe that his decision not to testify had been "altogether a voluntary one," because he had been on forced medication. Defendant said that he did not feel he could undergo direct examination and cross-examination and that, if he had not been taking medication, he might have made a different choice. The trial court simply noted its previous determination that defendant was competent; it did not further pursue the matter. Based solely on these statements, defendant argues that the trial court erred by failing to inquire further into his competence. We are not persuaded.

"[W]hen the trial court has reason to believe that a defendant is incompetent to proceed, it must suspend the proceeding and determine the competency of the defendant." *People v. Zapotocky*, 869 P.2d 1234, 1237 (Colo.1994). However, neither due process nor a defendant's right to counsel requires more than a single fair hearing with respect to this issue. "After a final determination of competency, the trial court is not required to order an additional competency examination merely because a request is made." *People v. Mack*, 638 P.2d 257, 263 (Colo.1981).

*People v. Bolton*, 859 P.2d 303 (Colo.App. 1993) involved a statement similar to that made here by defendant. There, the trial court, following an examination by a court-appointed psychiatrist, determined that defendant was competent. At his trial, however, defendant moved to proceed *pro se* and, during the trial court's advisement, stated that he had taken some antibiotics that had impaired his ability to think clearly.

On appeal, it was held that the trial court did not abuse its discretion by failing to suspend the proceedings and reconsider that defendant's competency. That was so because, given the court's previous determination of the competency issue, defendant's statement, standing alone, was not sufficient to raise a bona fide doubt as to his competence. *See also People v. Davis*, 851 P.2d 239 (Colo.App.1993) (trial court did not abuse discretion by refusing to order sixth psychi-

atric examination to determine defendant's competency).

Here, nothing beyond his ambiguous statement gave any indication that defendant's mental condition had deteriorated since the trial court's prior determination that he was competent. And, the very nature of that statement suggested that defendant was fully capable of understanding the proceeding and acting intelligently with respect to the advisement he had been given. Defendant's recognition that, if he had not been on medication, his reaction to the *Curtis* advisement might have been different did not suggest, in any way, that he was not then competent.

Further, by the time defendant made the statement, the trial proceedings had progressed almost to a conclusion, during which time the trial court had had a unique opportunity to observe defendant and his reactions to the proceedings. Given this opportunity and the court's prior determination that defendant was competent, we hold that the trial court did not abuse its discretion in not revisiting that question based solely on defendant's statement.

## II.

Defendant next contends that the trial court improperly denied his challenge for cause of a juror. We disagree.

During jury selection, a prospective juror indicated that he had a high opinion of police officers and that he might give more weight to the testimony of a police officer. He also indicated that, if he were in defendant's place, he probably would have a concern about having himself as a juror. Defendant argues that this juror's bias in favor of police officers required the court to sustain defendant's challenge for cause. We disagree.

A trial court must sustain a challenge for cause if there exists a state of mind in the juror evincing enmity or bias toward the defendant or the state. However, a court is not required to dismiss a juror simply because the juror has indicated a possible source of bias. *People v. Drake*, 748 P.2d 1237 (Colo.1988) (prospective juror's expression of some preconceived notion about case does not automatically mandate juror's exclusion).

Rather, the question is whether it is possible for that person to set aside any preconceived notion and base his or her decision on the evidence and the court's instructions. *People v. Drake, supra.*

While the prospective juror here indicated that he had a high opinion of police officers, he also said that it would not be difficult for him to put aside that opinion; he could listen to the testimony presented on the issues, weigh it, use his common sense and judgment, and make a ruling in his own mind. He gave assurances that he could follow the law and give defendant the benefit of the presumption of innocence.

Trial courts are afforded broad discretion in ruling on challenges for cause, and those rulings will be set aside only if an abuse of discretion is disclosed by the record. *Carrillo v. People*, 974 P.2d 478 (Colo.1999). Here, the record supports the trial court's determination that the juror would be able to render an impartial verdict based on the evidence presented at trial. Hence, the trial court did not abuse its discretion when it denied defendant's challenge for cause.

## III.

Defendant next contends that the trial court erred in refusing to suppress statements made by him during a three-hour videotaped interrogation. Again, we disagree.

After defendant came to the police station and announced that he had shot someone, he was frisked for weapons. During this procedure, he was questioned about his prior statement, but he was not advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court determined that defendant was in custody at that time, and because he had not been advised of his rights before he was questioned, the court suppressed those statements.

Thereafter, defendant was taken to an interview room where he was interrogated for

about three hours. That session was video-taped, and a written transcript of that session was made.

The court refused to suppress the statements made during this session, finding that the totality of the circumstances convinced it that defendant had voluntarily and knowingly waived his Fifth Amendment rights.

Later, another investigator also interviewed defendant for another three hours, but without providing him with any additional *Miranda* advisement. The trial court concluded that defendant should have received another advisement before further interrogation in this second session, and it suppressed all statements made by defendant in that interrogation.

Hence, the statements at issue on this appeal are only those made by defendant in the first three-hour session. The focal point of defendant's argument is the exchange that took place between him and the interrogating officer at the commencement of that session. The transcript of this session discloses that, after identifying himself and another officer present by name and as detectives, the interrogator advised defendant that he had the right to remain silent; that anything he might say could be used against him; that he had the right to speak with an attorney and to have the attorney present during any questioning; that, if he could not afford an attorney, the court would appoint one for him free of charge; and that he could terminate the interview at any time.

Defendant responded, "I understand what you're saying." However, upon being specifically asked if he understood his "rights," he replied:

I understand what you're saying to me. I guess what it is, are you saying to me that I, that I should have an attorney present while you question me?

The interrogator told defendant that "that's not what I'm saying." He re-advised defendant pursuant to *Miranda* and then asked him, "[D]o you wanna talk to us at this time?" Defendant responded:

Um, well the thing that I'm looking at later on is I wanna talk to you, but I also, I don't wanna have an attorney come to me

and tell me . . . this is not what I should've done.

The detective said that he could not control "what attorneys will tell ya." He also said that he wanted to know what went on; that he was sure that defendant also had questions for the detective; and he again asked, "So, will you talk to me?" Defendant said, "Yeah, I'll talk to you."

Relying on *People v. Kleber*, 859 P.2d 1361 (Colo.1993), defendant argues that the two references to attorneys made by defendant constituted an "ambiguous" request to have an attorney present, so that the detective was required to cease all questioning except that designed to clarify whether defendant was, in fact, requesting to be represented. Because the detective's further questioning went beyond this limited purpose, defendant asserts that his later statements should have been suppressed. In addition, defendant asserts that the detective's reference to defendant's wanting to ask questions made it appear that he could not do so unless he waived his rights, and that such advice constituted active misrepresentation to defendant so that any waiver was not knowingly made.

Considering the totality of the circumstances presented to it, the trial court found that defendant made a knowing and voluntary waiver of his rights and concluded that there was no basis for suppression of the statements that are at issue here. We concur.

As a clarification and extension of the requirements adopted by it in *Miranda*, the Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), held that, if an interrogated suspect clearly makes known his request for a lawyer, all questioning must immediately cease.

In *People v. Kleber, supra*, our supreme court held that, under *Edwards*, if the suspect's statement with respect to an attorney is ambiguous and not a clear request for counsel, there can thereafter be only limited questioning designed to clarify whether the suspect is, in fact, requesting representation.

In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), however, the Supreme Court concluded that, un-

less the suspect makes a clear request for counsel, questioning may continue. And, while it might be good police practice to attempt to clarify the meaning of a suspect's ambiguous reference to counsel, such clarification is not required.

*Miranda* and *Edwards* were decided under the Fifth and Fourteenth Amendments, and nothing either in *Kleber* or any other Colorado opinion has suggested that the limitation imposed in *Kleber* was mandated by any state constitutional requirement. Hence, to the extent that *Kleber* is inconsistent with *Davis v. United States, supra,* that state decision was necessarily overruled by *Davis.*

 Therefore, if, as both parties to this appeal seem to agree, defendant's remarks about counsel were ambiguous, nothing prevented the detective from continuing his questioning, and his failure to ask questions designed to clarify defendant's intent cannot constitute a basis for suppressing his later statements.

Moreover, in passing upon the question whether a suspect's reference to counsel is ambiguous, we must pay deference to the trial court's factual determinations. *People v. Romero,* 953 P.2d 550 (Colo.1998). Here, while the court did not specifically address the question of the ambiguity of defendant's statement, it properly applied the "totality of the circumstances" standard and found that defendant had voluntarily and knowingly waived his right to counsel. Implicit in that finding, of course, is a determination that defendant made no clear request for counsel.

 Likewise, we agree that the references to an attorney made by defendant did not constitute a clear, unambiguous request for counsel under *Edwards* or *Davis.* His first statement was simply a question whether the detective was advising him to have counsel. His second statement was ambiguous; in the same sentence, he first professed a desire to speak with the detective but also expressed that he did not want to be criticized by a lawyer later. These statements, in our view, did not amount to the clear request for counsel that is required under *Davis* to mandate a cessation of questioning.

· Further, we cannot conclude, as a matter of law, that the detective's response to defendant's statement about counsel constituted a material misrepresentation.

We conclude, therefore, that the trial court's findings of fact are supported by the evidence and that it committed no error in refusing to suppress the statements at issue.

### IV.

Defendant asserts that numerous errors occurred in the procedures used to determine his guilt of the charged offense and his affirmative defense of insanity. We reject all his assertions.

### A.

 Defendant's first assertion appears to be that § 16–8–104.5, C.R.S.1998, which requires a unitary trial of both the substantive guilt issues and the question of sanity, could not be applied to him because, to do so, would violate the proscriptions against *ex posto facto* laws in U.S. Const. Art. I, § 10, and in Colo. Const. art. II, § 11, and his right to due process.

Substantially the same issues were considered in *People v. Bielecki,* 964 P.2d 598 (Colo.App.1998), and assertions similar to defendant's arguments here were rejected. We consider that opinion persuasive, and we adopt its analysis. *See also Castro v. People,* 140 Colo. 493, 346 P.2d 1020 (1959) (single trial of guilt and sanity issues would not violate defendant's due process rights or his right against self-incrimination).

### B.

We also reject defendant's contention that his rights were violated by the introduction of evidence that he had refused to speak with a court-appointed psychiatrist.

 Defendant first argues that, because the People have the burden of proving sanity, once a defendant presents some evidence that raises the issue, proof of sanity is an element of a defendant's guilt. Therefore, he says, his privilege against self-incrimination is implicated when evidence is admitted on

the issue of sanity because it is an element of the offense. We are not persuaded.

Prior opinions clearly establish the distinction between the issues of sanity and guilt and how this distinction impacts upon a defendant's privilege against self-incrimination. *See Lewis v. Thulemeyer*, 189 Colo. 139, 538 P.2d 441 (1975) (the use of statements of defendant by psychiatrist in forming opinion as to the sanity of defendant does not impact upon the proof of guilt; it is limited to the issue of sanity); *People v. Galimanis*, 765 P.2d 644 (Colo.App.1988)(self-incrimination, by definition, applies to the admission of evidence to aid in establishing the guilt of the accused, not his sanity).

Defendant's argument that sanity is an element of guilt ignores the plain language that labels insanity as a defense. *See* § 16–8–103 and § 16–8–105.5, C.R.S.1998. Further, it is inconsistent with prior holdings that statements made by a defendant in a psychiatric exam may be admitted to prove a defendant's sanity, but not his guilt of the charged offense. Finally, the argument, if accepted, would not only preclude the People from using evidence of defendant's statements at a psychiatric examination in a unitary trial, it would also preclude them from using such evidence in the sanity portion of a bifurcated trial.

A defendant's sanity is not an element of the offense. Hence, a defendant's right against self-incrimination is not implicated when testimony is admitted only for the purpose of establishing defendant's sanity.

### C.

Defendant also challenges the constitutionality of § 16–8–106(2)(a), C.R.S.1998, which allows defendant's non-cooperation with the examining psychiatrist to be admitted into evidence on the issue of such defendant's sanity. Specifically, he contends that the admission here of evidence of his refusal violated his right against self-incrimination. We disagree.

■ It has previously been recognized that a defendant's silence at a sanity examination can be used as evidence of his or her sanity. *Johnson v. People*, 172 Colo. 72, 470 P.2d 37 (1970)(defendant's non-cooperation in psychiatric examination may be admitted at separate sanity trial; expert may testify as to any conclusions he or she is able to draw from the conduct or actions of the defendant during such an interview); *People v. Vialpando*, 954 P.2d 617 (Colo.App.1997) (no error in permitting court-appointed psychiatrist to testify at the sanity and guilt trials as to defendant's non-cooperation during his mental status examination).

■ Unlike in either *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) or *People v. Galimanis*, *supra*, in which the defendants had been affirmatively assured that their silence could not be used against them, no such advice was given defendant here. On the contrary, he was specifically informed that, if he refused to cooperate with the examining physician, such non-cooperation could be referred to at his trial.

In addition, the jurors here were instructed that they could consider defendant's refusal to speak with the examining psychiatrist only in considering defendant's mental state and for no other purpose.

Given these circumstances, we conclude that § 16–8–106(2)(a) is not unconstitutional, either on its face or as it was applied to defendant here.

### D.

In related arguments, defendant asserts that the trial court erred both in refusing to admit evidence that defendant refused to speak with the examining psychiatrist only because of advice he had received from counsel and in its refusal to instruct the jury to that effect. We reject both assertions.

■■ With respect to the court's refusal to instruct the jurors upon the subject, absent evidence of defendant's reason for his silence, an instruction would have been improper. And, even if such evidence had been received, any such instruction would have been improper as an inappropriate comment on the evidence. *See People v. Lybarger*, *supra*.

Further, the trial court concluded that any evidence respecting the reason for defendant's silence was irrelevant. We agree with this conclusion.

While evidence of defendant's refusal to cooperate in his psychiatric examination was admitted, the expert witness placed little, if any, weight upon that refusal in reaching his opinion that defendant was sane. Rather, his opinion was based upon a review of defendant's history and his observation of defendant during the trial.

Given the broad discretion that a trial court may exercise with respect to the admission of evidence, *see People v. Lowe*, 660 P.2d 1261 (Colo.1983), and the nature of the expert's testimony, we conclude that the court here committed no prejudicial error in refusing the proffered evidence.

## V.

Defendant also claims that the trial court erred when it allowed a witness to express an opinion on defendant's sanity as of dates other than the date of the offense. We conclude that no error occurred.

■■■■■ A lay witness may express an opinion as to the sanity of another. The two significant requirements which must be met before such an opinion may be received are: (1) the lay witness had an adequate means of becoming acquainted with the person whose sanity is in issue; and (2) the contacts with the person in question must have been proximate in time to the alleged offense. *People v. Medina*, 185 Colo. 101, 521 P.2d 1257 (1974); *People v. Galimanis, supra* (trial court improperly excluded testimony of witness who had minimal contact with defendant in the three months immediately preceding the crime; witness should have been allowed to render opinion upon defendant's mental condition during the time the witness had more substantial contacts with defendant, subject to determination of relevancy). *People v. Galimanis*, 944 P.2d 626 (Colo.App. 1997) (*Galimanis II*) (it is proper to inquire into the mental condition of the defendant both before and after the commission of the act).

In *Galimanis II*, the court held that the trial court properly exercised its discretion in excluding a psychiatrist's opinion with respect to defendant's legal sanity as of a date two years prior to the offense. The trial court there had permitted the psychiatrist to testify as to defendant's mental condition at that time, but had excluded the expert's opinion on defendant's sanity. The trial court's decision was upheld because such an opinion was not relevant and would have confused the jury.

■■■■ Here, defendant's supervisor expressed his opinion that defendant was sane as of nine days before the killing. Even if his testimony, as defendant contends, also expressed an opinion that defendant was sane at an earlier date, that opinion referred to defendant's sanity only three months before the killing.

Given the proximity in time between the offense and the dates with respect to which the supervisor testified, we cannot conclude that the trial court abused its discretion in refusing to exclude this testimony.

## VI.

Finally, defendant insists that the trial court committed prejudicial instructional error in refusing two of his tendered instructions relating to his affirmative defense of insanity. We conclude that the trial court properly refused both.

## A.

Defendant first argues that the instruction given by the court with respect to "deific delusions" was inadequate and that it should have been supplemented by one tendered by him. We disagree.

■■■■ Section 16–8–101, C.R.S.1998, requires that, to be legally insane, a defendant must be incapable of distinguishing right from wrong at the time of the commission of the act. The term "wrong" for this purpose is moral wrong, as distinguished from legal wrong. Further, "moral wrong" refers to an act measured by societal standards of morality rather than by a purely personal and

subjective moral standard. *People v. Serravo*, 823 P.2d 128 (Colo.1992).

In this sense, the fact that the individual acts under the delusion that God is compelling the act, the so-called deific-decree delusion, "is not so much an exception to the right-wrong test measured by the existing societal standards of morality as it is an integral factor in assessing a person's cognitive ability to distinguish right from wrong." *People v. Serravo, supra*, 823 P.2d at 139.

Here, the court told the jurors, among other things, that, with reference to the defense of insanity:

> 'INCAPABLE OF DISTINGUISHING RIGHT FROM WRONG' refers to cognitive inability, due to a mental disease or defect, to distinguish right from wrong as measured by a societal standard of morality, even though the person may be aware that the conduct in question is criminal....

Defendant sought an instruction that, among other things, would have told the jurors that:

> If Mr. Tally committed the act under a delusion, caused by mental disease or defect, that God had given him permission to commit the act, he must be judged insane.

 While the tendered instruction might properly have been given, we conclude that the instruction given by the court was proper and adequately informed the jurors of the issue to be decided by them. *See People v. Ridenour*, 878 P.2d 23 (Colo.App.1994) (no error to refuse tendered instruction if instructions given adequately cover subject).

### B.

Defendant also contends that the trial court improperly rejected an instruction which would have informed the jury that, following a verdict of not guilty by reason of insanity, any future determination as to whether defendant should be released would be made by the court and not by the Department of Human Services. Again, we disagree.

Jurors should be informed of the consequences of a finding that a defendant is insane, *i.e.*, that such defendant will be committed to a mental institution until it is determined that he or she is no longer insane. However, the jurors should also be told that such information is given to them only so that they may know the consequences of any verdict of insanity and that such information should have no bearing upon their determination of a defendant's mental status. *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031 (1979).

The trial court here gave an instruction meeting these criteria, but refused to amend the instruction to include information concerning what entity would determine whether sanity had been restored.

Again, while the giving of such an instruction would not have been improper, its refusal was, likewise, not improper. The instruction given by the court adequately fulfilled the purpose of such an informational instruction.

The judgment is affirmed.

Judge PLANK and Judge KAPELKE concur.