671 So.2d 307 (1996)
STATE of Louisiana
v.
Freddie ARMSTRONG.
No. 94-K-2950.
Supreme Court of Louisiana.
April 8, 1996.
Daryl Blue, Hunter, Scott, Blue & Johnson, Monroe, for Applicant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Charles L. Brumfield, Bastrop, for Respondent.
*308 LEMMON, Justice.
We granted certiorari in this second degree murder case to determine whether the defense proved by a preponderance of the evidence that defendant was insane at the time of the killing.

I
On January 24, 1992, defendant went to Loche's Mortuary to obtain a copy of his father's death certificate, but left while Mrs. Loche searched for the copy. About forty-five minutes later, defendant returned to the mortuary's business office with a briefcase. When Mrs. Loche, who was in the office with Rev. Fred Neal, asked defendant if he still wanted the certificate, defendant answered "no." Without saying anything to Rev. Neal, defendant opened the briefcase and revealed a large butcher knife. Mrs. Loche ran for help, leaving Rev. Neal alone in the office with defendant.
Shortly thereafter, Officer Billy Womack arrived at the mortuary and found Rev. Neal on the floor of the office, while defendant stood over him with a bloody knife. Officer Womack asked defendant what was wrong, but defendant just stared at him. As Officer Womack checked Rev. Neal for vital signs, Mr. Loche yelled that defendant was "the one having the seizure." Officer Womack then drew his weapon and ordered defendant to drop the knife. Ignoring the officer, defendant walked up the nearby stairway as additional officers arrived. After pausing for a while, defendant turned and descended the stairs, while the officers tried to communicate with him. With Womack and other officers watching, defendant severed Rev. Neal's head from his body. Grinning, defendant picked up the head by the ears and held it up for the officers to see. According to Officer Womack's description, defendant "appeared to be a person possessed." He then put the head down, picked up Rev. Neal's headless body and placed it in a chair, picked up the head, and walked upstairs and dropped it in the toilet. Returning downstairs, defendant put the knife in the briefcase, put on his cap and walked toward the entrance door as if nothing had happened. The officers thereupon arrested him for murder. Officer Womack stated that he continually attempted to communicate with defendant, who did not respond, and that the officers never felt threatened by him.
Examination of the body revealed that Rev. Neal had been stabbed more than twenty times, with chest wounds being the cause of his death.
The trial court immediately appointed a sanity commission. After a hearing on April 7, 1992, the trial court found defendant incompetent to proceed to trial and ordered him institutionalized at Feliciana Forensic Hospital.
The trial court held another hearing on July 10, 1992, at which the judge found that defendant had regained the capacity to proceed. Defendant was then arraigned, pleading not guilty and not guilty by reason of insanity. After pre-trial proceedings and a change of venue, the trial began on September 27, 1993.
Medical evidence established that defendant, himself a minister, had been medically discharged from the service as a paranoid schizophrenic in the late 1960s during the Viet Nam conflict. Defendant had been admitted to mental institutions in 1969, 1970, 1973, 1974, 1980, 1983, 1987 and 1992, having been released three days before the killing of Rev. Neal. Four of the five psychiatric and psychological experts at trial concluded that defendant's mental illness rendered him unable to distinguish right from wrong at the time of the offense. On the other hand, the prosecutor presented evidence, in addition to the one physician who reached the contrary conclusion, that defendant behaved normally on the morning of the homicide and that even a paranoid schizophrenic in a psychotic state can know the difference between right and wrong.
The jury rejected the insanity defense and returned a verdict of guilty. The court of appeal affirmed as to the sufficiency of the evidence of insanity, also rejecting several other assignments of error. 94-307 (La.App. 3 Cir. 11/2/94); 649 So.2d 683. On the insanity issue, the court correctly outlined the appropriate legal principles and painstakingly reviewed the evidence presented at trial.
*309 Noting medical evidence that one of the principal symptoms of a person's being in a psychotic state is the inability to communicate, the court referred to testimony that defendant was able to communicate on the day of the killing and thereafter. The court also pointed out a possible motivation for avenging a past wrong perceived by defendant as having been inflicted upon him by Rev. Neal, as well as selective responses to hallucinatory voices, one telling him at the outset to stab and the other telling him during the stabbing that his actions were wrong. Noting that the jury concluded that defendant, at the time of the offense, either was not mentally ill or was not rendered incapable by a mental illness of distinguishing right from wrong, the court held that when the record evidence was viewed in the light most favorable to the prosecution, a rational trier of fact could have concluded that the defendant failed to prove by a preponderance of the evidence that he was legally insane at the time of the offense.
On defendant's application, we granted certiorari to consider the insanity issue. 94-2950 (La. 4/7/95); 652 So.2d 1339.

II
La.Rev.Stat. 14:14 provides:
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
There is a legal presumption that the defendant is sane and responsible for his or her actions. La.Rev.Stat. 15:432. Accordingly, the defense has the burden of proving, by a preponderance of the evidence, that the defendant at the time of the offense was incapable of distinguishing between right and wrong with reference to the pertinent conduct. La.Code Crim.Proc. art. 652. To sustain a conviction in which insanity is an issue, the appellate court, viewing the evidence in the light most favorable to the prosecution, must determine that a rational trier of fact could have concluded that the defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981).

III
After defendant's psychotic episode in Viet Nam and medical discharge from the service, he was diagnosed in 1968 as having paranoid schizophrenia. In January 1969, he was hospitalized as a mental patient in Los Angeles for one month. In August 1969, he was again hospitalized, but refused to take the prescribed medication. After his discharge, he returned to Louisiana.
In April 1970, defendant was admitted to Central Louisiana State Hospital, where he was diagnosed as a paranoid schizophrenic and treated for six weeks with various medications. In December 1973, he spent another seven weeks at the same hospital, having the same diagnosis.
During these periods, defendant suffered from delusions, which are a form of mental disorder that gives rise to a false belief held without a basis in reality, and from auditory hallucinations, which involve the perception of non-existent voices or commands.
In April 1980, defendant was hospitalized at the V.A. Hospital in Shreveport for one month. At the time of his admission, he was obsessed with religion and had taken a gun to church to kill the devil. Although he didn't believe he needed medication, the medicine administered alleviated his paranoia. Six months later, he was admitted to the same hospital for six weeks after stating he had been called to preach and to kill someone. He was diagnosed as schizophrenic and classified as a danger to others.
In June 1980, defendant was first seen by Dr. William Erwin, a psychiatrist, at the Monroe Mental Health Clinic on referral from the Shreveport V.A. Hospital. At the time he was fairly well controlled with prolixin-D, a long-acting medication that controls the symptoms of schizophrenia. Dr. Erwin continued to see defendant every two weeks over a period of more than ten years, until the doctor's retirement in 1990.
Dr. Erwin diagnosed defendant as suffering from an acute schizophrenic disorder, *310 which had first manifested itself in Viet Nam and which was not curable. The disease could be controlled by medication, but was aggravated by stress. Because of the severity of defendant's condition, Dr. Erwin required him to visit every two weeks and to have shots of long-acting (over a period of two to three weeks) prolixin-D on every visit.
In 1983, the police returned defendant to the V.A. Hospital at the request of his family because he had refused to comply with his prescribed treatment and medication schedule. Defendant had not had an injection in two months, and his wife had never seen him in that condition.[1] Restarted on prolixin-D with two injections within a week, defendant improved rapidly and was discharged to continue under Dr. Erwin's care.
In November 1987, defendant's wife and minister took him to Dr. Erwin.[2] He was uncommunicative, had delusions about his wife and Dr. Erwin working against him, had auditory hallucinations of voices of good and evil about Christ and the anti-Christ, and was not sleeping. He stated that the government had programmed him to kill his minister (who was his uncle). Dr. Erwin involuntarily committed him to Woodland Hills, a psychiatric hospital in Monroe, for three weeks.
Because defendant's wife was sensitive to his behavioral changes and notified Dr. Erwin of warning signs, Dr. Erwin was able to avoid further psychotic episodes by regulation of medication, particularly in periods of stress. Dr. Erwin retired in 1990, but defendant apparently continued to be seen every two weeks at Woodland Hills.
On January 10, 1992, defendant had his maintenance therapy injection of prolixin-D at Woodland Hills. He stated that he had not been sleeping, and he was observed to be agitated, withdrawn and pacing the floor.
Three days later and eleven days before the killing of Rev. Neal, the coroner committed defendant involuntarily to Woodland Hills on an emergency basis.[3] He was noted to be psychotic, suicidal, gravely disturbed and agitated, dangerous, hyperalert, insomniac and possessing an extremely impaired judgment. The hospital records also noted as a severe stressor that he had sued his bank and was going to court that week. During the first three days, he physically attacked staff members, resulting in his being placed in restraints. After his violent behavior subsided, defendant was released from the hospital on January 21, three days before he killed Rev. Neal. Defendant was to return on Friday (the day of the killing) for an injection and to discuss defendant's desire to transfer his treatment to a private physician.
A few days before the killing, a police officer stopped defendant for speeding. Defendant appeared coherent and complained that the officer had stopped the wrong person.
On the day of the killing, defendant telephoned his brother at 6:00 a.m. and told him that he (defendant) had been nominated for President of the United States. Thereafter, according to the information related by defendant to the psychologist who examined him about one year later, defendant went to Woodland Hills to obtain his scheduled injection, but left without obtaining the medicine or seeing the doctor with whom he had an appointment. He looked for someone to talk with, visiting his brother who was not at his place of business, returning home about 10:30 a.m. to make telephone calls, visiting his mother who was preparing to leave, and then going to the office of the clerk of court.[4]
*311 Defendant then went to the mortuary for the first time about 12:30 p.m., but returned home and made telephone calls looking for someone with whom to talk. He then placed the butcher knife in his briefcase and went back to the mortuary. He was sitting in his car outside the building listening to music on the radio when he saw Rev. Neal enter the mortuary, and a voice said, "That's him." Believing the delusion that Rev. Neal was the anti-Christ and heeding the hallucinatory command, defendant set out to cut Rev. Neal's head from his body to prove that he, as an anti-Christ, would not bleed. Defendant admitted to the psychologist, however, that he considered not killing Rev. Neal and would not have done so if Rev. Neal had gone upstairs with him. Defendant further stated that Rev. Neal was one of a group of preachers who had "taken his stone" while he was hospitalized at Woodland Hills a week earlier.[5]
On the night of the killing, defendant was taken from the jail to the doctor to treat a cut on his hand of unknown origin. After the visit, defendant tore off the bandages and bit his wound, causing the officer to place him in restraints.
On the day after the killing, Dr. Francis Elias, a radiologist, was called by a deputy sheriff to commit defendant for a psychiatric evaluation because defendant was disoriented, hallucinating and uncontrollable. Dr. Elias stated he was able to communicate with defendant "to some degree" and that defendant spoke sentences that were not "real clear" or "real logical." Upon urging by his uncle, defendant finally took his prescribed medication.
While in jail thereafter awaiting the sanity hearing, defendant again refused to take his medication, and he continued to exhibit weird behavior He stopped up the urinal and flooded his cell. He walked around naked carrying a bible, and he stated his fear that the federal government had been trying to kill him for several years. However, the jailers were able to converse with him on numerous occasions.
After the trial court declared defendant incompetent to stand trial and committed him to the mental institution, the initial psychiatric examination revealed that defendant was belligerent, threatened to kill the staff, believed he was being poisoned with prolixin-D, and was paranoid and decompensating. The hospital records showed defendant expressed delusional religious thoughts and was preoccupied with the anti-Christ.
Several medical experts testified at trial. Dr. Erwin, the psychiatrist who treated defendant regularly for over ten years, stated that defendant becomes grossly psychotic when he is off the medication, having observed defendant in a psychotic state on two occasions in which defendant exhibited paranoid delusions and hallucinations. The doctor opined that the danger signs of a psychotic episode exhibited by defendant when he was under stress or failed to take medication included agitation, insomnia, preoccupation with religious matters concerning good and evil and the anti-Christ, and difficulty in communication. In Dr. Erwin's view, there was no way that defendant could have distinguished right from wrong while in the psychotic state that he observed. However, he admitted that defendant, when not in a psychotic state, would be legally sane and that persons who are psychotic sometimes are still capable of distinguishing right from wrong.
Dr. Frank Weinholt, a psychiatrist who served on the Sanity Commission, attempted to examine defendant in February and March after the January 1992 killing, but was unable to do so because defendant was extremely unstable, delusional and obsessed with destroying those who represented the anti-Christ. Dr. Weinholt found defendant to be still psychotic and unable to relate to reality several weeks after the crime. In July, after he had regained the ability to *312 proceed to trial, defendant admitted to the doctor that he heard a voice telling him to stop during the stabbings and explained to the doctor that God forgave him for what he had done.
According to Dr. Weinholt, defendant in his psychosis at the time of the crime felt he was sending the anti-Christ to hell and was not a danger to others than the anti-Christ. He cut off Rev. Neal's head to prove the reality of his delusion and showed the head to the officers to demonstrate that reality. The doctor opined that it was characteristic of paranoid schizophrenia for the person to operate under delusions for a long time before committing some inappropriate act or crime. Dr. Weinholt concluded that defendant was insane during the time of the crime because he couldn't reconcile man's law and God's law while in the psychotic state.
Dr. Norman Mauronner, a psychiatrist, examined defendant in April and May of 1992 while he was committed at the forensic facility after the court had found him incompetent to proceed to trial. Dr. Mauronner noted that defendant did not respond to the police commands, being as if in a trance, and would not have done what he did in front of an armed and uniformed policeman if he had not been in a psychotic state at the time. Although believing defendant was competent to proceed to trial at the time of his examinations, Dr. Mauronner opined on the basis of the overall records of the hospitals and the doctor that defendant at the time of the offense was unable to make a valid decision between right and wrong.
Dr. Debora Murphy, a member of the sanity commission, first examined defendant on February 17, 1992 and believed him then capable of proceeding to trial, contrary to the other commission members. Noting that a mentally ill person can still know right from wrong and that it might be possible, although not probable, for a person in the active phase of a schizophrenic disorder not to be able to distinguish right from wrong, Dr. Murphy believed that defendant at the time of the killing knew the difference between God's law and man's law. Although she had not seen the records of Dr. Erwin who had treated defendant for ten years or of Dr. Thomason who had performed extensive psychological testing, she concluded that he was sane at the time of the offense, in part because he believed he had already been forgiven for his actions.
Dr. David Thomason, a psychologist who tested and examined defendant in December 1992 (almost a year after the killing), believed that defendant was severely mentally retarded and was self-centered, compulsive and hysterical. During the examination interview, defendant recalled and related to Dr. Thomason the details of the events during the day leading up to the killing, as outlined earlier in this opinion.
After a second interview, Dr. Thomason concluded, based on the two interviews and the records of the hospitals and treating doctors, that defendant was clearly psychotic, not in touch with reality, and was acting out his fixed delusion and therefore could not determine right from wrong at the time of the incident.
Thus, the defense's case on insanity consisted of the twenty-five year history of mental illness with delusions, auditory hallucinations, religious obsessions and occasional psychotic episodes, particularly when defendant was subjected to stress or failed to take his medication; the testimony of three psychiatrists and one psychologist who opined that defendant could not distinguish right from wrong at the time of the killing; evidence of defendant's dispute with his bank causing him stress, a precursor of psychotic episodes, and of his involuntary commitment to a mental institution shortly before the killing and his violent behavior there; and extensive evidence of bizarre behavior, before and after the killing, which was consistent with conduct that has led to his numerous hospitalizations.
In rebuttal of this extensive evidence of insanity at the time of the crime, the prosecutor relied on one expert and several lay witnesses. Dr. Murphy, although not disagreeing with the diagnosis of paranoid schizophrenia or the occurrence of a psychotic episode around the time of the crime, opined that defendant could distinguish right from wrong when he killed Rev. Neal in a *313 public display of bizarre circumstances and then decapitated him in front of numerous police officers, holding up the severed head to show the validity of his delusion. She did not elaborate in direct examination on the basis of that opinion, although she testified extensively as to what defendant told her in the two interviews. Although Dr. Murphy in the first interview about three weeks after the killing found that defendant was "not reality based" because of present delusions and hallucinations, she stated on cross-examination that one is not excused from knowing the difference between right and wrong because of a thought content disorder. She pointed out that defendant knew the difference between God's law and man's law at the time of the crime.
Other evidence deemed significant by the court of appeal was testimony that defendant was able to communicate at pertinent times, since inability to communicate is one of the principal symptoms of a person's being in a psychotic state. However, the most significant evidence in this respect came from the officers who witnesses the decapitation. They testified that defendant appeared to be in a trance, was non-communicative despite their best efforts, and ignored their commands to drop the knife although they had weapons backing up their commands.
Other evidence stressed by the district attorney was the fact that defendant did not attempt to kill, or even threaten, anyone but Rev. Neal and that he had sat in his car peacefully until he saw Rev. Neal enter the mortuary. Such behavior, however, is consistent with the delusion that Rev. Neal was the anti-Christ and with the auditory hallucination telling defendant "That's him." The doctors who found defendant insane at the time of the crime commented that he was no danger to anyone but the anti-Christ of his delusion. The fact that the policemen did not feel threatened was not inconsistent with that delusion or with the hallucinatory command.
As to defendant's allegedly selective responses to hallucinatory voices, one telling him to kill and the other telling him later that killing is wrong, it was the very nature of defendant's delusion that Rev. Neal was the anti-Christ that compelled defendant to send the anti-Christ to hell. Evidence that a person, in a psychotic state and operating under a long-standing delusion about the anti-Christ, is unable to evaluate competing auditory hallucinations is hardly preponderating proof of ability to distinguish right from wrong.
Moreover, the fact that defendant decapitated Rev. Neal in view of several police officers militates strongly against a conclusion that he knew he was doing wrong at the time. Indeed, the most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. Conversely, evidence of criminal conduct in plain view of law enforcement officials is a significant indication of inability to distinguish right from wrong.
We conclude that the evidence of insanity, viewed in the light most favorable to the prosecution, clearly preponderates in favor of the defense and that a rational juror could not have reached a contrary decision.
Accordingly, the judgment of the court of appeal is set aside, the conviction is reversed, and the case is remanded to the district court for the appropriate disposition.
Judge NED E. DOUCET, Jr., Court of Appeal, Third Circuit, sitting by assignment in place of Justice JAMES L. DENNIS. DOUCET, J., not on panel. Rule IV, Part 2, § 3.
KIMBALL, J., dissents and assigns reasons.
MARCUS, J., dissents.
KIMBALL, Justice, dissenting.
Because I believe a rational trier of fact, when viewing the evidence adduced at trial in the light most favorable to the prosecution, could have concluded defendant failed to prove by a preponderance of the evidence he was insane at the time of the offense, I respectfully dissent from this court's rejection of the jury's determination in this matter.
*314 Under La.Rev.Stat. 14:14,
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
Thus, as aptly noted by the court of appeal in the instant case, the existence or nonexistence of a mental disease or defect is not the issue. Rather, the question to be answered by the trier of fact is simply whether the offender could distinguish right from wrong with reference to his conduct at the time he committed the offense. See also State v. Silman, 663 So.2d 27, 32 (La.1995) ("Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question.")
It is presumed that the defendant is sane and responsible for his or her actions, and the defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La.C.Cr.P. art. 652; La.Rev.Stat. 15:432. The question of whether a defendant has affirmatively proved his insanity is one to be determined by the trier of fact. All the evidence, including both expert and lay testimony, and the actions of the defendant, should be considered by the trier of fact in determining sanity.
On appeal, appellate courts must determine whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could conclude that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Silman, 663 So.2d at 32; State v. Peters, 643 So.2d 1222, 1225 (La. 1994); State v. Nealy, 450 So.2d 634 (La. 1984). A determination of the weight of the evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Silman, 663 So.2d at 35.
Although the defendant's psychological history may indicate he suffered from a psychological defect over a period of years, this conclusion does not automatically resolve whether or not a rational trier of fact could have found, viewing the evidence in the light most favorable to the prosecution, defendant did not prove by a preponderance of the evidence that he did not know right from wrong because of this defect at the time he committed the murder. The medical testimony on the issue of whether defendant was insane and knew the difference between right and wrong at the time of the murder is contradictory and therefore, when viewed in the light most favorable to the prosecution, supports a rational trier of fact's conclusion defendant did not prove his insanity by a preponderance of the evidence.
Dr. Erwin, defendant's regular treating physician for over ten years prior to the murder testified that when the defendant was "psychotic" he was not capable of distinguishing right from wrong; however, he added that he had only seen defendant in this condition twice in the ten year period and that even individuals who are in a psychotic state are still capable of distinguishing right from wrong. Dr. Weinholt, a psychiatrist who served on the Sanity Commission, examined defendant one or two months after the murder, but found defendant was delusional and obsessed with the anti-Christ. He examined defendant again several months later, and, according to Dr. Weinholt, defendant told him that a voice told him to stop after he began the attack and that God had forgiven him for what he had done.
Dr. Mauronner, a psychiatrist, also examined defendant a few months after the murder in the context of a determination as to whether defendant had the capacity to proceed to trial. Although the doctor concluded defendant had the capacity to proceed to trial, based on an examination of hospital and physician records, the doctor concluded the defendant was insane at the time of the murder.
Dr. Murphy, another member of the sanity commission, examined defendant within a *315 month after the murder and concluded he was legally sane at the time of the offense, particularly given the fact he believed he had already been forgiven for his actions. She also specifically testified at trial that although a person might have a thought disorder, that person can still know the "difference between right and wrong" and the "difference between God's law and man's law."
Dr. Thomason made an extensive examination of defendant almost a year after the murder and concluded that defendant was mentally retarded, self-centered, compulsive and hysterical. During the examination, defendant acknowledged to Dr. Thomason that he knew he did wrong, acknowledged that while he was stabbing the victim a voice said, "this is wrong", and that prior to the attack, he had considered not killing Reverend Neal because of his internal struggle over whether it would be wrong to kill Reverend Neal.
Because the medical testimony did not foreclose the possibility that defendant did know right from wrong at the time of the murder and in fact included substantial expert testimony to the contrary, I do not believe there is any basis for this court to substitute its opinion on this issue for the jury's determination in this matter. There was more than enough evidence to support a finding that a rational juror could have found defendant did not prove by a preponderance of the evidence that he was legally insane at the time he committed the murder. Therefore, I respectfully dissent.
NOTES
[1] Defendant was newly married, having been divorced from his first wife.
[2] Defendant's wife, who constantly monitored his behavior for signs of approaching psychosis such as insomnia and preoccupation with religion, had Dr. Erwin's private telephone number.
[3] The coroner who committed defendant to the mental hospital shortly before the killing did so because defendant, with a long history of mental problems, was dazed, hallucinatory, depressed, insomniac and a danger to himself with threats of suicide. At the trial, the coroner expressed no opinion as to defendant's state of mind at the time of the killing.
[4] Defendant visited the clerk of court to examine his minister's registration certificate. Other than his request to change the spelling of his church on the twenty-year old certificate from "St." to "Saint," the deputy clerks did not notice any out-of-the-ordinary behavior.
[5] The record does not explain this expression, but the psychologist interpreted it to describe a "sexual" attack on defendant by the preachers. However, a psychiatrist who examined defendant after the killing stated that the group of ministers who helped restrain him in his recent hospitalization robbed him of his stone and made him "vomit it up." The psychiatrist understood defendant to mean that placing him in restraints was almost like a sexual attack and that his "stone" was like a commission from God to be a preacher.