NOT DESIGNATED FOR PUBLICATION


STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-159


STATE OF LOUISIANA

VERSUS

TIMOTHY TEASLEY


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NUMBER 332,513
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE

**********


SHARON DARVILLE WILSON
JUDGE

**********


Court composed of Jonathan W. Perry, Sharon Darville Wilson and Guy E. Bradberry, Judges.


AFFIRMED.

**Chad M. Ikerd**
**Ikerd Law Firm, LLC**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(337) 366-8994**
**Counsel for Defendant/Appellant:**
**Timothy Teasley**

**J. Phillip Terrell, Jr., District Attorney**
**Meredith Smith, Assistant District Attorney**
**Ninth Judicial District Court**
**Parish of Rapides**
**State of Louisiana**
**Post Office Box 7358**
**(337) 473-6650**
**Alexandria, Louisiana  71306-7358**
**Counsel for Appellee:**
**State of Louisiana**

**WILSON, Judge.**

Defendant, Timothy Teasley (Teasley), appeals his convictions on the charges of second degree murder and attempted second degree murder, asserting that he was legally insane at the time the crimes were committed. For the reasons that follow, we affirm the convictions and sentences.

I.

## ISSUES

The defense contends that it proved by a preponderance of the evidence that Teasley was legally insane and could not distinguish between right and wrong at the time these crimes were committed. The defense further contends that the trial court erred in denying its motion to re-urge sanity hearing before trial and that the denial of said motion violated Teasley's constitutional rights to due process and a fair trial.

II.

## FACTS AND PROCEDURAL HISTORY

On February 14, 2017, Teasley entered the Chi Town convenience store in Alexandria, Louisiana, and shot at an employee, Lorans Alzoubi, who quickly took cover in the store's aisles. Teasley then fired multiple gunshots behind the counter, striking another employee, Thaer Zidon (Zidon). Zidon was able to retrieve a weapon and return fire. Teasley was wounded and fled the scene. Zidon died from his wounds.

On April 26, 2017, a Rapides Parish grand jury indicted Teasley on one count of second degree murder, a violation of La.R.S. 14:30.1, and one count of attempted second degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30.1. The indictment was amended on September 19, 2022, but continued to charge second degree murder and attempted second degree murder.

Trial began with jury selection on September 27, 2022. On September 30, 2022, the jury found that Teasley was guilty as charged on both counts. On October 17, 2022, the trial court sentenced Teasley to life imprisonment for second degree murder and to forty years for attempted second degree murder, with the sentences to run concurrently. Teasley now appeals. This court affirms the convictions and sentences.

## III.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, this court reviewed the instant appeal for errors patent on the face of the record and found none.

## IV.

## LAW AND DISCUSSION

In his first assignment of error, Teasley argues that he proved by a preponderance of the evidence that he was legally insane at the time of the offense and cites *State v. Armstrong*, 94-2950 (La. 4/8/96), 671 So.2d 307, for support. That case sets forth the basic test on the sanity issue:

[Louisiana Revised Statutes] 14:14 provides:

> If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.

> There is a legal presumption that the defendant is sane and responsible for his or her actions. La.Rev.Stat. 15:432. Accordingly, the defense has the burden of proving, by a preponderance of the evidence, that the defendant at the time of the offense was incapable of distinguishing between right and wrong with reference to the pertinent conduct. La.Code Crim.Proc. art. 652. To sustain a conviction in which insanity is an issue, the appellate court, viewing the evidence in the light most favorable to the prosecution, must determine that a rational trier of fact could have concluded that the defendant did not prove by a preponderance of the evidence that he was insane at the time

2

of the offense. *State v. Claibon*, 395 So.2d 770 (La.1981); *State v. Roy*, 395 So.2d 664 (La.1981).

*Armstrong*, 671 So.2d at 309.

In a decision rendered a few months before *Armstrong*, the Louisiana Supreme Court gave a more detailed explanation of the analysis:

> In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; *State v. Williams*, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. *State v. Bibb*, 626 So.2d 913 (La.App. 5th Cir.1993), *writ denied*, 93-3127 (La. 9/16/94); 642 So.2d 188; *State v. Claibon*, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters*, *supra*; *State v. Claibon*, *supra*.

> In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283 (La. 10/17/94); 643 So.2d 1222; *State v. Nealy*, 450 So.2d 634 (La.1984); *State v. Price*, 403 So.2d 660 (La.1981); *State v. Claibon*, *supra*; *State v. Roy*, 395 So.2d 664 (La.1981).

> . . . .

> As this court has previously stated, a determination of the weight of evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *See State v. Bibb*, *supra*; *State v. Claibon*, *supra*; *State v. Nolan*, 503 So.2d 1186 (La.App. 3d Cir.), *writ denied*, 507 So.2d 226 (La.1987). If rational tiers of fact could disagree as to the interpretation

of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *State v. Mussall*, 523 So.2d 1305 (La.1988); *Jackson v. Virginia*, *supra*.

It is well settled that sanity is presumed and the defendant has the burden of proving by a preponderance of the evidence that he was legally insane at the time of the commission of the offenses. In the trial court's reasons for judgment, the trial judge expressed his difficulty in reaching a conclusion based solely on the contradictory expert testimony. He was required by the laws of this state to weigh all the evidence presented before him and to make a rational decision regarding the defendant's claim of insanity[,] and he did.

*State v. Silman*, 95-154, pp. 7, 12–13 (La. 11/27/95), 663 So.2d 27, 32–35.

Noting his own history of diagnosed mental difficulties, Teasley cites the following passage from *Armstrong*, 671 So.2d at 312:

[T]he defense's case on insanity consisted of the twenty-five year history of mental illness with delusions, auditory hallucinations, religious obsessions and occasional psychotic episodes, particularly when defendant was subjected to stress or failed to take his medication; the testimony of three psychiatrists and one psychologist who opined that defendant could not distinguish right from wrong at the time of the killing; evidence of defendant's dispute with his bank causing him stress, a precursor of psychotic episodes, and of his involuntary commitment to a mental institution shortly before the killing and his violent behavior there; and extensive evidence of bizarre behavior, before and after the killing, which was consistent with conduct that has led to his numerous hospitalizations.

Armstrong's bizarre behavior included beheading the victim's corpse in front of law enforcement and then placing the headless body in a chair and the severed head in a toilet. *Id*. Generally, Armstrong's actions indicated that he did not correctly perceive reality. However, in the present case, the offense committed by Teasley was not bizarre. Although violent and tragic, the shooting at issue is similar to many other convenience-store shootings that have been considered by this court. Unlike the acts in *Armstrong*, the crime at issue does not, in itself, indicate that

4

Teasley could not correctly perceive reality. In contrast, Teasley took actions that did not give any indication of insanity.

On appeal, Teasley says little about the evidence he adduced at trial in his effort to prove his alleged insanity. Instead, his argument focuses on *Armstrong* and on the testimony of Dr. Jessica Boudreaux, a member of the sanity commission appointed by the trial court.

Dr. Boudreaux, when called as a witness by the State, testified, in part, as follows:

> Q    All right. I want you to -- this next paragraph in your report is so important for this jury to hear. Based on your review of the video tape and with the phone call, you know, unlike other -- you've seen everything. Let's look at that next paragraph in your report.
>
> A    Yes.
>
> Q    And I want you to tell the ladies and gentlemen of the jury, I want you to read those first four sentences.
>
> A    Okay. All right. Mr. Teasley's behavior has been consistent over the past five years. He has been observed to engage appropriately when it benefits him and to be uncooperative and refused to participate when he does not believe it's in his best interest. This type of behavior is consistent with antisocial personality disorder and malingering and not an organic mental illness.
>
> Q    All right. Read that next sentence.
>
> A    Mr. Teasley's action [sic] are calculated and intended to promote his agenda. He thinks that by feigning a mental illness he can be exempt from criminal responsibility.
>
> Q    And what is feigning -- feigning means what . .
>
> A    Feigning means . .
>
> Q    . . faking?
> A    . . faking. Yes, sir.
>
> Q    So, in your expert opinion he thinks that if he fakes that he's mentally ill he can be exempt from criminal responsibility, is that correct?
> A    That's my opinion, yes.

Q    You reviewed all of his medical records including the medical records of the guy that they heard from earlier, I forgot his name but . .

BY MR. GUILLOT:
Dr. Gary Fillette.

Q    Fillette.   You read everything. Tell the jury about your conclusions there in that next sentence after reviewing those medical records.

A    Okay.  After reviewing his medical records Mr. Teasley suffers from substance abuse disorder, which at times can mimic a mental illness such as schizophrenia.  According to the DSM-5 the diagnosis of a schizophrenia spectrum disorder can not be made in the presence of substance abuse. In review . .

. . . .

Q    All right.  So, if there is a history of substance abuse, in the world of forensic psychiatry and in the world of general psychiatry you can not make any type of -- because it can mimic schizophrenia, right?

A    Correct.

Q    You can not make any schizophrenia diagnosis nor do you believe nor have you ever found that this guy, Mr. Teasley, is schizophrenic?

A    Not in my experience and the review of my records, no.

. . . .

Q    Did you find that he suffers a personality disorder . . . ?

A    Right.  So, like I explained before,  I believe he has antisocial personality disorder.

Q    All right.  And I think right here that -- can you tell the jury why you feel that he has this personality disorder as opposed to some type of mental illness?

A    Yes, of course.  Okay.  So, again, I'm going to refer to my notes[,] and this is the diagnostic criteria for antisocial personality disorder.  So, there . . . are four main features and then some sub-features within them.  So, 'A' disregard for and violation . . . of others' rights since the age of 15 as indicated by one of the following seven sub features.  So, number 1, failure to obey laws and norms by engaging in behavior which results in criminal arrest or would warrant criminal arrest.  According to a

6

review of his records Mr. Teasley has been arrested over 60 times in the past. . . .

. . . .

Q    All right. Let's talk about number 2, you were about to start on that one. And these are things you see in a person with antisocial personality disorder not a mental illness?

A    Correct. Number 2, lying, deception and manipulation for profit or self-amusement. This appears to be consistent with Mr. Teasley's behavior. Impulsive behavior, Mr. Teasley has a history of impulsive behavior. Irritability and aggression, manifested as frequently assaults others or engages in fighting. Mr. Teasley has a history of violent behavior since he was a juvenile, he has been arrested for assault multiple times.

. . . .

A    Number 5 . .

. . . .

A    . . blatantly disregards safety of self and others. Mr. Teasley has demonstrated a disregard for others in his criminal history and observed behavior in jail and at [East Louisiana Mental Health System]. Number 6, a pattern of irresponsibility, again, consistent with Mr. Teasley's behavior. Number 7, lack of remorse for his actions. He has shown no remorse for the pain and suffering that he has caused.

Q    So, he hits every one?

A    Yes.

Q    And in the DSM-5 . . . I think it says, presence of some of these would indicate anti personality disorder. I don't know the number threshold but he hits every single one?

A    Yes.

Q    So, there's no doubt, right, in your mind?

A    In my professional . .

Q    Opinion.

A    . . opinion, yes.

. . . .

7

Q    I knew I had remembered them. Those are all personality disorders[,] but they don't alleviate the person's ability to distinguish right from wrong?

A    Correct.

Q    All right. What are the other diagnostic criteria, is there anything else that Mr. Teasley -- I'm -- I'm specifically looking at page 3 . .

A    Yes.

Q    . . of your report to the Judge. The other diagnostic criteria.

A    Right. Okay. So -- so, what I just listed was 'A'. So, there are four main diagnostic criterias [sic]. So, I listed 'A' and then the sub set of that. B, is the person is at least 18 years old, he's 30 years old at this time. C, conduct disorder was present by history before age 15. So, in reviewing his records, he does have a history of disruptive behavior as a child. He was suspended in the 7th grade. So, he fulfils that criteria. And D, the antisocial behavior does not occur in the context of schizophrenia or bipolar disorder.

Q    He has neither one of those mental illnesses?

A    I do not believe that he suffers from schizophrenia or bipolar.

Q    And you put that in your report, I do not believe that he has schizophrenia or bipolar disorder?

A    Correct.

Q    Those are classified as mental illnesses not personality disorder?

A    Yes, sir.

Q    Okay. But what's that next sentence mean?

A    So, the next sentence was, I would attribute any psychotic or bizarre behavior in his past to substance abuse.

Q    Right. Got you. And again, we talked about malingering so we're not going to go back over that -- that paragraph because it talks about malingering which is the intentional faking of symptoms to avoid something like criminal responsibility. Let me ask you something, you actually went so far as to review Mr. Teasley's -- because the jury saw this, Mr. Teasley's interview with police that night?

A    Correct.

8

Q The night that he shot these people. What were you looking for, why did you want -- why did you want to see that as an expert?

A So, obviously when the issue of not guilty by reason of insanity, you want information, you want to see what was going on with him at the time that the crime was committed because he was uncooperative with me and didn't provide me with a lot of information. I thought it was important to get a glimpse of actually what was going on. So, by watching that video of his interaction with the police shortly after the incident in question it kind -- it gives us a picture of what he -- what was going on with him looking from the outside, his behavior. So, I'm looking for his behavior, if someone is psychotic they're -- might be responding to internal stimuli so they might be talking to themselves or looking around the room like, you know, they're hearing voices or something like that. I didn't observe anything that appeared to be psychotic. Consistent with his behavior throughout the time that I've been asked to participate, it was consistent. He was uncooperative, he didn't answer the questions that were asked of him, he was vague, kind of allusive [sic] when asked questions about, you know, why he had a dog -- why he didn't buy a dog, you know, wouldn't answer the question directly. So, again, it's consistent with his behavior in choosing not to answer questions when it suits him. And again, I'm trying to see, was there any indication that he was psychotic or anything bizarre or strange[,] and it didn't appear to be, it just appeared that he was uncooperative.

Q And there was, I think, they had him in the room and like a minute or two before they came in I think he said a couple of things[,] but I do that in my office too. That's -- that's not indicative necessarily of any psychosis. He's not hearing from demons or anything like that?

A It didn't appear -- no, it didn't appear.

Q Okay. All right. You saw the video footage which this jury saw of the shooting?

A Yes, sir.

Q At the gas station. Why was that important for any expert who sits in that chair to have looked at?

A So, again, I want to see his behavior, his actions, how he approaches the situation. And based on my observation, he conceals himself, he was covered so that's a deliberate act in trying to hide his identity from the police or onlookers. So, that's a deliberate act. And then he's very direct and deliberate in his actions when he shoots the victim. So, he does -- one got shot, he specifically avoids the girl at the counter and then again shoots

the victim.  And he walks away.  He doesn't call for help or any type of thing to show any type of remorse.  So, in my observation of that, it's a deliberate act.

Q    And that was important, correct . .

A    Yes.

Q    . . in your evaluation?

A    I believe so, yes.

Q    And your report to the Judge, that was critical?

A    Yes.

Q    All right.  Now, there was one other thing that just strikes me[,] and that was that jail call.  Did you hear that?

A    I did.

Q    Ladies and gentlemen of the jury heard it.

A    Yes.

Q    And it is what it is but, you think that's important for any expert who sits in that chair to have listened to?

A    I do.

Q    And what did you glean from that as an expert in forensic psychiatry?

A    So, I think that phone call showed that when he's in a situation that he feels comfortable, he can carry on a conversation, he can ask questions, he can engage when it's his choice to do so, when he feels like he is in control of this situation.  And then I also believe by him saying, I'm going to go to trial plead NGBRI and get out of here in six months.  I think that shows that he is plotting, he's deliberate, he has a plan, he understands what's going on[,] and I think that further proves that in these situations where he refuses to cooperate or refuses to answer questions it's his choice, it's a volitional choice for him not to answer when requested.

Q    All right.  And did that phone call exhibit a pretty good understanding of the criminal proceedings?

A    Yes, absolutely.

Q    And when you said he was going to use NG. .

10

. . . .

A    The insanity plea, not guilty by reason of insanity.

Q    All right.  I'm almost done.  And we talked a lot about malingering, you talked a lot more about malingering on page 3 of your report[,] and . . . I guess you need to at least quickly tell the jury, you know, we use the word malingering but there's a specific diagnostic trail to get to that, right?

A    Correct.

Q    Not only have those three doctors down at Jackson determined it[,] but I think you have too, right?

A    Yes, based on . .

Q    Let's – let's kind of go through that . . . tell the jury the diagnostic path to arrive at a diagnosis that he's faking everything.

A    Okay.  So, going over the criteria again or?  Okay.  Yes.  Okay.  So, again, does he present in a medical/legal context, is there marked discrepancy between the person who's claimed -- the claimed stress or disability and the objective findings, lack of cooperation during the diagnostic evaluation and complying with the prescribed treatment regimen and again, the presence of antisocial personality disorder.

Q    All right.  Read that next sentence, that's important, I think.

[A]   Based on these criteria, it is my opinion that Mr. Teasley is malingering.

Q    All right.  Or in layman's terms, faking everything, correct?

A    Yes.

Q    All right.  Let's get right down to the crux of this why you were asked by this Court to do an independent evaluation for this jury.

A    Yes, sir.

Q    That's your last paragraph . . . so, let's . .

. . . .

Q    . . - - let's look at it.

A    Yes, sir.  Regarding mental state at the time of the offense, [La.R.S. 14:14] defines legal insanity as follows: if the

11

circumstances indicate that because of a mental disease or defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offense shall be exempt from criminal responsibility.

Q    All right.  And that's the question you were asked . .

A    Correct.

Q    . . by the man behind, I need you to answer for us[,] and you bolded your opinion[,] and it's short and sweet.

            . . . .

A    Yes, sir.  It is my opinion to a reasonable degree of medical certainty that at the time that the crime was committed Mr. Teasley was capable from distinguishing between right and wrong.

Q    Was capable of distinguishing right from wrong, is that right?

A    Yes, sir.

Q    Next sentence?

A    I do not believe that he suffers from an organic mental illness.  It is my opinion that he has antisocial personality disorder, substance abuse disorder and that he is malingering.

Q    And that remains your conclusion today, correct?

A    Yes, sir.

As the colloquy shows, Dr. Boudreaux's assessment included her viewing of recorded video footage of the shooting at issue, video footage of the police interview, and listening to an audio recording of a jail call by Teasley.

Furthermore, *Armstrong*, 671 So.2d 307, is factually distinguishable because Armstrong clearly displayed bizarre behavior during the course of the offense he committed.  Teasley's actions in the instant case are similar to those in scores of similar shootings seen by this court over the years.  His arguments regarding Dr. Boudreaux's opinion simply question the weight that her testimony carried with the jury.  However, it is clear from *Silman*, 663 So.2d 27, that appellate review of the

12

jury's sanity assessment arises within the framework of *Jackson v. Virginia*, 443 U.S. 307. As such, the matter of the weight of the evidence was within the province of the jury. *Silman*, 663 So.2d 27. The jury, like Dr. Boudreaux, was able to view the videos of the shooting and the police interview and listen to the recorded jail call. In light of *Silman,* the evidence was sufficient for the jury to rationally conclude that Teasley knew right from wrong at the time of the shootings.

In his second assignment of error, Teasley argues that the trial court erred in not granting his motion for a new sanity hearing before trial and that this denial violated his constitutional rights to due process and a fair trial.

On September 14, 2017, the defense filed a written motion asserting that Teasley lacked the capacity to proceed. The trial court appointed a sanity commission. On November 16, 2017, the trial court conducted a sanity hearing, determined that Teasley was unable to proceed, and committed him to a mental health facility. On January 13, 2020, the trial court conducted another hearing and determined that Teasley was competent to proceed.

On May 13, 2021, the defense filed a motion to re-urge sanity hearing. The court appointed a new sanity commission on May 17, 2021, and conducted a competency hearing on July 17, 2021. Due to conflicting reports, the trial court sent Teasley back to the mental health facility for evaluation. On April 11, 2022, the facility returned Teasley "fully restored." The defense then moved for a new competency hearing, suggesting that Teasley might not remain competent. The court made a handwritten denial of that motion, without reasons, on May 10, 2022.

Teasley filed a motion to withdraw his not guilty plea and entered a plea of not guilty and not guilty by reason of insanity on June 22, 2022. He also filed a notice of intent to introduce evidence regarding his sanity at the time of the offense. The trial court held a hearing on June 27, 2022. After hearing expert witnesses and

13

argument from defense counsel, the trial court determined that Teasley was competent to proceed. On June 29, 2022, the trial court again ordered a sanity commission, which was meant to address Teasley's sanity at time of the offense and his competence to stand trial. The trial court appointed Dr. Boudreaux to the commission. On July 6, 2022, Dr. Luke Verret was appointed to the commission. In the meantime, Teasley sought review of the May ruling in this court. This court noted that Teasley had not presented sufficient evidence to support his argument. *State v. Teasley*, 22-366 (La.App. 3 Cir. 7/8/22) (unpublished opinion).

On September 27, 2022, the parties began to select a jury for trial. The minutes state that, in open court, the defense filed a motion to re-urge sanity hearing, which the court denied. In the motion, defense counsel alleged that Teasley exhibited "bizarre behavior," including yelling and cursing, in the courtroom on September 26, 2022. Due to this behavior, Teasley was removed from the courtroom. Counsel also stated that he was unable to have "meaningful conversation with the Defendant," as the latter refused to discuss the case with him. Counsel also stated that it was "apparent that everyone recognizes that Mr. Teasley is not well, is not faking his mental health issues, and is in need of treatment that the jail cannot provide." Counsel provided no affidavits or other supporting documentation from any jail personnel or health professionals who might have shed light on the situation. This lack of supporting information was the same problem presented in Teasley's earlier writ. *Teasley*, 22-366.

The following colloquy occurred on September 26, 2022:

**(MR. TEASLEY WAS BROUGHT INTO THE COURTROOM AND IS SCREAMING AND CURSING)**

BY THE COURT:
    Hey Mr. Teasley . .

MR. TEASLEY: (screaming)

14

Man, guess what -- guess what fuck everybody in the courtroom I don't give a fuck, me.

BY THE BAILIFF:
Hey, hey come over here.

. . . .

BY THE BAILIFF:
Sit down, just sit down.

**(MR. TEASLEY CONTINUES TO SCREAM AND USE EXTREME FOUL LANGUAGE AT THE COURT)**

. . . .

BY THE COURT:
Madam Clerk, this is criminal docket number . .

**(MR. TEASLEY CONTINUES TO SCREAM FOUL LANGUAGE AND BEING VERY DISRUPTIVE)**

. . . .

BY THE COURT:
. . okay -- All right. Mr. Teasley now I want you to listen closely to me . .

MR. TEASLEY:
(screaming and cursing at the court)

BY THE COURT:
. . now, I'm not releasing you.  So, what we're going to do today, we're going to bind you . .

MR. TEASLEY:
(screaming and cursing at the court)

BY THE COURT:
. . no, no, we're going to bind you over for trial.

. . . .

MR. TEASLEY:
(screaming and cursing at the Court)

BY THE COURT:
.. no, all you need to do is me -- no, all you need to do is hear me.  Can you hear me?

. . . .

15

BY MR. GIORDANO:
Judge, I'd ask that he be held in contempt.

**(MR. TEASLEY SCREAMING AND CURSING)**

BY THE COURT:
I can't -- all right, Mr. Teasley, Mr. Teasley during the trial if you're disruptive I will have to remove you ..

MR. TEASLEY: (screaming)
Fuck you, you ain't helping me ho, bitch if you ain't sending me . . .

BY THE COURT:
. . . -- Mrs. Renee can you hear me?

MR. TEASLEY:
(screaming and cursing at the court)

BY THE COURT:
All right. All right. In Code of Criminal Procedure Article 831 et seq if Mr. Teasley will not behave in court, the Court is allowed to remove him from court . . .

MR. TEASLEY: (screaming)
You trying to fucking play me[,] and you can't.

BY THE COURT:
No one's playing you, sir.

MR. TEASLEY:
(screaming and cursing at the court)

BY THE COURT:
If you're disruptive[,] you're going to be removed for [sic] court, that's what I need to be able to tell you.

MR. TEASLEY:
(screaming and cursing at the court)

BY THE BAILIFF:
Is he ready to go, Judge?

BY THE COURT:
Yes, he's -- he can go, he can go. All right. See about some street clothes for him too, please.

**(MR. TEASLEY IS REMOVED FROM THE COURTROOM)**

However inappropriate or disruptive Teasley's behavior was on September 26, it falls well short of being bizarre. The above colloquy indicates that Teasley knew exactly where he was. He simply did not want to be there.

The State cites the legal standard for competency and testimony from one of Teasley's competency proceedings to demonstrate that he understood the proceedings and thus was legally capable of standing trial. Such an analysis is unnecessary. As already noted, this court previously denied Teasley's writ on this issue due to a lack of supporting evidence. The present argument fails for the same reason.

Due to the lack of any supporting information to support his argument, we find that this assignment lacks merit.

## V.

## CONCLUSION

For the reasons fully discussed herein, we affirm Timothy Teasley's convictions and sentences on the charges of second degree murder and attempted second degree murder, finding that he was not legally insane at the time the crimes were committed.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

17